STATE OF NORTH CAROLINA, ON RELATION OF JOHN R NDOLPH IN-
GRAM, COMMISSIONER OF INSURANCE OF NORTH CAROLINA, PLAIN-
TIFF v. RESERVE INSURANCE COMPANY, DEFENDANT AND NORTH
CAROLINA INSURANCE GUARANTY ASSOCIATION, THIRD-PARTY PLAIN-
TIFF AND PHILIP R. O'CONNOR, AS DIRECTOR OF INSURANCE OF THE STATE OF
ILLINOIS AND AS DOMICILIARY RECEIVER OF RESERVE INSURANCE COMPANY, THIRD-
PARTY DEFENDANT AND ROBERT P. BINKLEY, BENJAMIN T. SIMMONS,
JR., WALLACE GRAHAM GETCHELL, AND ARNOLD ENGLAND, IN-
DIVIDUALLY AND AS REPRESENTATIVE OF THE POLICYHOLDERS OF RESERVE IN-
SURANCE COMPANY WHO ARE CITIZENS OR RESIDENTS OF NORTH CAROLINA OR
WHO HOLD POLICIES ISSUED UPON PROPERTY IN NORTH CAROLINA, AND
CAROLINA INSURANCE SERVICE, INC., THIRD-PARTY PLAINTIFFS

No. 113

(Filed 17 August 1981)

Insurance § 1— insolvent insurer—special deposit—payment to Guaranty Associa-
tion

Application of the Quick Access Statute, G.S. 58-155.60, which requires
that special deposits made by an insolvent insurer be paid to the N.C. In-
surance Guaranty Association for use in paying covered claims against the in-
solvent insurer of $100 to $300,000, to the insolvency of a foreign casualty com-
pany did not divest the G.S. 58-185 lien rights in the deposit of N.C.
policyholders whose policies were issued before the statute was enacted into
law. While the Guaranty Association has the initial right to use deposit funds
to cover operating expenses incident to the insolvent insurer, all deposit funds
must be paid to claimants pro rata as provided by G.S. 58-185, and if all
claimants are satisifed either directly by the Guaranty Association or by the
Commissioner of Insurance (if the claim is under $100) and deposit funds re-
main, then and only then are such funds to be permanently credited to the
Guaranty Association for its expenses.

APPEAL by the Commissioner of Insurance and third-party
plaintiffs Carolina Insurance Service, Inc., and Binkley et al., from
decision of the Court of Appeals, 48 N.C. App. 643, 269 S.E. 2d
757 (1980), reversing judgment of *Hobgood, J.,* at the 6 July 1979
Session of WAKE Superior Court.

These proceedings were spawned by the insolvency of
Reserve Insurance Company, an Illinois corporation doing
business in North Carolina. On 7 May 1979 Reserve was enjoined
by the Circuit Court of Cook County, Illinois from doing business
except with the consent of the Illinois Director of Insurance. On
16 May 1979, the North Carolina Commissioner of Insurance

ordered Reserve to cease writing new or renewal business in this State until its minimum maintained capital was restored. Reserve was adjudicated insolvent, and the Illinois Director of Insurance was appointed "Domiciliary Receiver" on 29 May 1979, with powers to liquidate the business affairs of Reserve. The North Carolina Commissioner of Insurance filed this action against Reserve on 31 May 1979 pursuant to the Uniform Insurers Liquidation Act which is codified as part of Article 17A of Chapter 58 of the General Statutes.

The Commissioner alleged the insolvency of the defendant company and sought appointment as receiver in North Carolina. The Commissioner was appointed "Ancillary Receiver," and a restraining order was entered. This initial order of the North Carolina Court was followed by a preliminary injunction and order continuing the receivership on 8 June 1979. The relief sought was not resisted by Reserve and judgment by default was entered on 14 September 1979 making the ancillary receivership permanent. On the same date, the superior court entered a separate order requiring the Commissioner as "Ancillary Receiver" to liquidate Reserve's North Carolina assets, process claims and file his report with the court.

The only asset of Reserve in North Carolina is a special deposit of securities having a face value of $185,000. The securities were deposited with the Treasurer of North Carolina pursuant to Article 20 of Chapter 58 of the General Statutes as a condition of doing business in North Carolina. Reserve was required to deposit the securities and give the Commissioner a power of attorney to use the securities to pay liabilities of North Carolina policyholders resulting from any default of Reserve.

The North Carolina Insurance Guaranty Association also began operations to pay liabilities and claims for North Carolina policyholders resulting from the insolvency of Reserve. The Guaranty Association was created by the Insurance Guaranty Association Act, which is Article 17B of Chapter 58 of the General Statutes. The Association is composed of all casualty insurance companies which transact business in North Carolina. When a member company is adjudged insolvent by a court of competent jurisdiction, the Association bears the responsibility for paying claims against the company which are greater than

$100 but not to exceed $300,000 per claim. The payments are financed through membership assessments.

On 8 June 1979, the Guaranty Association filed a motion, which was allowed, to intervene in the Commissioner's liquidation suit. On 15 June 1979, the Guaranty Association filed an "answer, counterclaims, crossclaims, and third-party complaint," the basic purpose of which was to assert the Association's rights to the special securities deposit both as lienor and under a piece of legislation enacted by the General Assembly on 23 May 1979 as part of the Insurance Guaranty Association Act entitled the "Quick Access Statute" and codified as G.S. 58-155.60. A motion for partial summary judgment was filed with this pleading requesting the court to enter judgment declaring the Guaranty Association's right to have the special deposit of Reserve delivered to the Association to pay covered claims as provided in G.S. 58-155.60. The Commissioner as ancillary receiver in answer denied the essential allegations of the Guaranty Association.

On 2 July 1979, Carolina Insurance Service, Inc.,[1] the general agent for Reserve in North Carolina and several individual policyholders on their own behalf and on behalf of other individual policyholders with Reserve, filed motions to intervene in the liquidation suit which were allowed. These third-party plaintiffs sought a declaratory judgment (1) that the policyholders of Reserve had a lien on the special deposit superior to that of the Guaranty Association and (2) that the deposit not be delivered to the Guaranty Association. On the same day, the Commissioner as Ancillary Receiver moved to dismiss the claim of the Guaranty Association to the deposit, alleging G.S. 58-155.60 was void and unconstitutional.

The superior court heard arguments of the parties concerning disposition of the special deposits. The Guaranty Association contended G.S. 58-155.60 gave it a right to the deposit to cover *claims and expenses* arising out of the insolvency of Reserve. The Commissioner, Carolina Insurance Service, Inc. and the individual policyholders argued that allowing the Guaranty Association's

---

1. Carolina Insurance Service, Inc., alleged it held $81,326.25 in funds, representing premiums for policies written prior to the liquidation proceeding. Carolina sought to create a trust for its policyholders in these funds and determine whether they should be paid to the domiciliary receiver or the ancillary receiver. These questions raised by Carolina are not at issue in this appeal.

claim to the special deposit pursuant to G.S. 58-155.60 would interfere with a vested property right of the policyholders in that it would unlawfully and retroactively divest them of their lien rights in the special deposits as specified in G.S. 58-185.

On 6 July 1979, the superior court denied the Guaranty Association's motion for summary judgment. In support of this order, the superior court listed these material facts which were not excepted to by any party on appeal: (1) Reserve was adjudicated insolvent on 29 May 1979; (2) there were more than 1700 policyholders in North Carolina who held contracts of insurance with Reserve written between 30 May 1978 and 7 May 1979; (3) all these policyholders will be entitled to return of the unearned premiums by virtue of the insolvency; (4) the total amount of unearned premiums equals approximately $184,528.49 of which amount approximately $89,096.78 represents claims to be paid by the Guaranty Association and $95,431.71 represents total unearned premiums up to a maximum of $100 on each policy which will not be paid by the Guaranty Association; and (5) the Quick Access statute, G.S. 58-155.60 was enacted on 23 May 1979 with an effective date of 23 May 1979. The court then concluded as a matter of law that G.S. 58-155.60 could be applied prospectively only and therefore not to the insurer insolvency in question in this case and that the policyholder liens against the special deposits pursuant to G.S. 58-185 were superior to any rights of the Guaranty Association. The Guaranty Association appealed to the Court of Appeals.

The Court of Appeals reversed the superior court and remanded the case, ordering that the special deposits be delivered to the Guaranty Association. That court reasoned G.S. 58-155.60 could be applied retroactively. The Court of Appeals stated:

> We hold that the superior court committed error when it did not order the deposits of Reserve delivered to the Guaranty Association. The claimants under G.S. 58-185 will retain their lien rights and may proceed against the Guaranty Association to the extent of the deposit for any claims they may have had under G.S. 58-185 which are not satisfied by the Guaranty Association.

48 N.C. App. at 648, 269 S.E. 2d at 760.

The Commissioner as Ancillary Receiver, Carolina Insurance Service, Inc., and the individual policyholders appealed to this Court which granted their petitions for discretionary review pursuant to G.S. 7A-31.

*Rufus L. Edmisten, Attorney General, by Richard L. Griffin, Assistant Attorney General, for State of North Carolina ex rel. Commissioner of Insurance, plaintiff appellant.*

*Craige, Brawley, Lüpfert & Ross, by Cowles Lüpfert, C. Thomas Ross and Terrie A. Davis, attorneys for Carolina Insurance Service, Inc., Robert P. Binkley, Benjamin T. Simmons, Jr., Wallace Graham Getchell and Arnold England and the North Carolina policyholders of Reserve Insurance Company, third-party plaintiff appellants.*

*Allen, Steed and Allen, P.A., by Arch T. Allen, III, and Ann Hogue Pappas, attorneys for North Carolina Insurance Guaranty Association, third-party plaintiff appellee.*

HUSKINS, Justice.

This case involves construction of G.S. 58-155.60, the "Quick Access" statute, and whether it applies retroactively to divest the lien of North Carolina policyholders of Reserve, whose policies were issued before the statute was enacted into law, in certain securities deposited by Reserve to cover claims in the event of its default. We conclude the statute can be applied constitutionally to the present case.

Before we explain the effect of G.S. 58-155.60 in the present case, some background information is relevant to show how our regulated insurance industry operates when a foreign insuring company defaults on its obligations in this State.

Three separate articles of Chapter 58 of the General Statutes apply to the present case: Article 20—Deposits by Insurance Companies, originally enacted in 1909; Article 17A—Mergers, Rehabilitation and Liquidation of Insurance Companies, which contains the Uniform Insurers Liquidation Act, originally enacted in 1947; and Article 17B—the Insurance Guaranty Association Act, originally enacted in 1971. The older articles were neither repealed nor superseded by the later articles. All the provisions have one basic purpose: to better protect North Carolina

claimants and policyholders. The interrelationship of the provisions is readily apparent on the facts of this case: The security deposit of Reserve was made and held pursuant to Article 20; the ancillary receivership of the Commissioner was established pursuant to Article 17A and the Guaranty Association is paying claims and liabilities pursuant to Article 17B.

Beginning in 1909, the State required certain insurance companies to make deposits with the Commissioner of Insurance. G.S. 58-182. Foreign casualty companies such as Reserve have been required to make deposits since 1945. G.S. 58-182.1. Such deposits are a prerequisite for a license to do business in this State. G.S. 58-188. The deposits are in an amount specified by statute, G.S. 58-182, -182.1, -182.2, and are not made in currency but in bonds of the United States, North Carolina or cities and counties of this State. G.S. 58-182.3. The deposits are to be delivered by the Commissioner to the Treasurer of the State for safekeeping to "be held exclusively and solely for the protection of contract holders." G.S. 58-182.6; *see also* G.S. 58-188.1. The depositing insurance company is entitled to the interest from the securities "until the company fails to pay any liability arising upon any" covered policy, "and thereafter the interest, so long as the liability exists shall be payable to the Commissioner of Insurance, to be applied, if necessary, to the payment of such liability." G.S. 58-183.

The deposit statutes also require a power of attorney to the Commissioner "authorizing the sale or transfer of said securities or any part thereof for the purpose of paying any of the liabilities provided for in this Article." G.S. 58-182.5. "If the company fails to pay any of its liabilities on its contracts . . . , the Commissioner of Insurance shall, upon application of the party to whom the debt or money is due, . . . proceed to sell at public auction such an amount of securities as, with the interest in his hands, will pay the sum due and expenses of sale, and out of the proceeds of sale pay said sums and expenses . . . ." G.S. 58-184. G.S. 58-185 creates a lien in the deposit for policyholders and a procedure[2] for disposition of the funds on deposit in the event of insolvency of an insurer as follows:

---

2. This procedure for disposition was altered by the adoption of the Uniform Insurers Liquidation Act in 1947 in that the ancillary receiver of a foreign insurer is to liquidate "special deposit claims." G.S. 58-155.12(b).

Upon the securities deposited with the Commissioner of Insurance by any such insurance company, the holders of all contracts of the company who are citizens or residents of this State at such time, or who hold policies issued upon property in the State, shall have a lien for the amounts due them respectively, under or in consequence of such contracts for losses, equitable values, return premiums, or otherwise, and shall be entitled to be paid ratably out of the proceeds of said securities, if such proceeds be not sufficient to pay all of said contract holders. When any company depositing securities as aforesaid becomes insolvent or bankrupt or makes an assignment for the benefit of its creditors, any holder of such contract may begin an action in the Superior Court of the County of Wake to enforce the lien for the benefit of all the holders of such contracts. The Commissioner of Insurance shall be a party to the suit, and the funds shall be distributed by the court, but no cost of such action shall be adjudged against the Commissioner of Insurance.

*See also* G.S. 58-188.1. Deposits pursuant to Article 20 constitute a *trust* for the benefit of North Carolina policyholders and are not *assets* of the insolvent insurance company. *Continental Bank & Trust Co. v. Gold,* 140 F. Supp. 252 (E.D.N.C. 1956); 2 Couch on Insurance §§ 22:94, 22:96, 22:111 (2d Ed. 1959); 19 Appleman, Insurance Law and Practice § 11094 (1979 Supp.); *see also Guaranty Association v. Assurance Co.,* 48 N.C. App. 508, 269 S.E. 2d 688, *cert. den.,* 301 N.C. 527, 273 S.E. 2d 453 (1980), *cert. granted,* --- U.S. --- , 68 L.Ed. 2d 838, --- S.Ct. --- (1981). Such deposits supplement the general corporate law which does little to protect claimants and policyholders of insolvent insurers. Reserve made deposits pursuant to Article 20 having a face value of $185,000. The policyholders are entitled to the lien provided for in G.S. 58-185.

The deposits required by Article 20 and the general corporate law did not go far enough to protect North Carolina policyholders and claimants. To further this desired protection, the legislature adopted in 1947 as part of Article 17A the Uniform Insurers Liquidation Act. *See* 25 N.C. L. Rev. 429 (1947). It provides the mechanism for liquidation of Reserve. Illinois has also adopted the Uniform Insurers Liquidation Act. Ill. Rev. Stat. Ch. 73 §§ 833.1 to 833.13. A domiciliary receiver was appointed in Il-

linois. Under the Act, the Commissioner is appointed ancillary receiver in this State. G.S. 58-155.9(b); G.S. 58-155.12(a).

Both the North Carolina and Illinois versions of the Uniform Act make specific reference to "special deposits" and recognize the right of an ancillary receiver to liquidate claims against these deposits. G.S. 58-155.10(11), -155.12(b) and -155.15(c); Ill. Rev. Stat. Ch. 73 §§ 833.1(8), 833.6 and 833.8. A "special deposit claim" is defined as "any claim secured by a deposit made pursuant to statute for the security or benefit of a limited class or classes or persons. . . ." G.S. 58-155.10(11). The funds in question in this case are such deposits. Such deposits are expressly excluded from general assets. G.S. 58-155.10(5). The ancillary receiver "shall, as soon as practicable, liquidate from their respective securities those special deposit claims . . . which are proved and allowed in this State. . . ." G.S. 58-155.12(b). "The owners of special deposit claims against an insurer for which a receiver is appointed in this or any other state shall be given priority against their several special deposits in accordance with the provisions of the statutes governing the creation and maintenance of such deposits." G.S. 58-155.15(c). Thus, whatever Article 20, *i.e.*, G.S. 58-185, says about priorities, controls. Article 17A merely provides supplemental procedures to expedite the liquidation process and specifies the date on which all rights are fixed:

> The rights and liabilities of the insurer and of its creditors, policyholders . . . and all other persons interested in its estate shall, unless otherwise directed by the court, be *fixed as of the date on which the order directing the liquidation of the insurer is filed* in the office of the clerk of the court which made the order, subject to the provisions of G.S. 58-155.29 with respect to the rights of claimants holding contingent claims.

G.S. 58-155.25 (emphasis added).

In 1971, the legislature effected additional protection for North Carolina policyholders by enacting Article 17B, creating an organization, the Insurance Guaranty Association, which would promptly ascertain claims against an insolvent insurer and pay each covered claim of $100 to $300,000 which arises within thirty days of a determination of insolvency. G.S. 58-155.48(a)(1). The purpose of the association "is to provide a mechanism for the pay-

ment of covered claims under certain insurance policies, to avoid excessive delay in payment, and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer. . . ." G.S. 58-155.42. At least forty-five states have enacted versions of a Model Post-Assessment Guaranty Association Act. *See* Hank, Post-Assessment Guaranty Funds: Are They the Ultimate Solution to the Insolvency Problem? 1976 Insurance Law Journal 482. It serves as an adjunct to normal liquidation proceedings. *See Cooper Claims Service v. Arizona Insurance Guaranty Ass'n.,* 22 Ariz. App. 156, 158, 524 P. 2d 1329, 1331 (1974). The Guaranty Association is a non-profit unincorporated legal entity which covers all property and casualty insurance business transacted in North Carolina. G.S. 58-155.46. All insurance companies licensed to transact business in North Carolina and not exempted by G.S. 58-155.43 must become members of the Association. G.S. 58-155.46. The Association acts as insurer. G.S. 58-155.48(a)(2).

To pay covered claims, the Guaranty Association assesses its members based upon the percentage of business transacted in North Carolina. G.S. 58-155.48(a)(3). The Association has the power to borrow funds to pay covered claims. G.S. 58-155.48(b)(2). Once the Association pays a claim, any person receiving payment "shall be deemed to have assigned his rights under the policy to the Association to the extent of his recovery from the Association." G.S. 58-155.51(a). The Act also provides that "[t]he expenses of the Association . . . shall be accorded the same priority as the liquidator's expenses." G.S. 58-155.51(b).

This is a basic outline of the law as it existed in May 1979 when Reserve was adjudicated insolvent and G.S. 58-155.60 was enacted by the legislature. The parties refer to this statute as the "Quick Access" statute, and it is captioned "use of deposits made by insolvent insurer." It reads in pertinent part as follows:

Notwithstanding any other provision of Chapter 58 of the General Statutes pertaining to the use of deposits made by insurance companies for the protection of policyholders, the Commissioner shall deliver to the Association, and the Association is hereby authorized to expend, any deposit or deposits previously or hereinafter made, whether or not required by statute, by an insolvent insurer to the extent those

deposits are needed by the Association first to pay the covered claims in excess of one hundred dollars ($100.00) as required by this Article and then to the extent those deposits are needed to pay all expenses of the Association relating to the insurer.

. . . .

The Association shall account to the Commissioner and the insolvent insurer for all deposits received from the Commissioner hereunder, and shall repay to the Commissioner a portion of the deposits received which shall be equal to an amount computed by adding the lesser of the amount of the covered claim or one hundred dollars ($100.00) for each covered claim. Said repayment shall in no way prejudice the rights of the Association with regard to the portion of the deposit repaid to the Commissioner. After all of the deposits of the insolvent insurer have been expended by the Association for the purposes set out in this section, the member insurers shall be assessed as provided by this Article to pay any remaining liabilities of the Association arising under this Article.

The statute was ratified a week before Reserve was adjudged insolvent. The legislature specified that the Act would become effective upon ratification. 1979 N.C. Sess. Laws c. 628, § 2. The Guaranty Association sought access to the special deposits pursuant to this statute and was opposed by both the Commissioner and policyholders of Reserve.

No one contends the Quick Access statute fails to pass constitutional muster except in its application to the facts of this case. The policyholders contend that application of the statute's provisions to the Reserve insolvency will result in a retroactive divestment of the liens of North Carolina policyholders which were effective before the statute was ratified. The Commissioner contends that although the Guaranty Association has the right to use the deposits pursuant to the Quick Access statute, the Association is required to repay him the full amount of the deposit.

The Guaranty Association contends the Quick Access statute is a procedural and remedial statute intended to expedite payment of claims against the insolvent insurer by using the special deposit to pay those claims directly rather than later reimbursing

the Guaranty Association for the claims. Thus, it does not divest policyholders of any rights in the deposits but merely provides an expedited procedure for obtaining those deposits. The Association also contends the Commissioner is not entitled to a full repayment of deposits.

The Quick Access statute applies "[n]otwithstanding any other provision of Chapter 58 of the General Statutes pertaining to the use of deposits made by insurance companies for the protection of policyholders. . . ." The statute thus controls should there be any conflict in pre-existing provisions. The statute goes on to provide that "the Commissioner shall deliver to the Association" and "the Association is hereby authorized to expend . . ." the deposit. The statute expressly mandates the delivery to and use of the deposit by the Guaranty Association. The statute applies "to any deposit or deposits previously or hereinafter made. . . . " This coupled with the legislative mandate that the statute apply on ratification is a clear expression that the legislature intended the statute to apply to the present case. The policyholders make four arguments that this retroactive application of the statute creates new classes and priorities of claims against deposits.

The policyholders argue that as the Association pays claims and expenses from the deposit, the "lien would dwindle and possibly disappear." This is not so. The lien of the policyholders remains as long as needed. The Association has subrogation rights to the liens. G.S. 58-155.51(a). Thus, as the Association pays claims, it continuously acquires the liens. Once the Guaranty Association has paid claims between $100 and $300,000, and has returned deposit funds covering claims less than $100, all liens in the deposit pursuant to G.S. 58-185 are extinguished or have been acquired by the Association. The policyholders still have a lien until satisfied by the Association or the Commissioner. The lien rights of policyholders transfer with the deposit proceeds when they pass from the Commissioner to the Association. *See Surety Corp. v. Sharpe*, 236 N.C. 35, 72 S.E. 2d 109 (1952).

The policyholders next argue the statute eliminates interest on the deposits that would otherwise be earned and applied to payment of liabilities pursuant to G.S. 58-183. The only policyholders who can complain on this point are those with claims under $100. All other claims are promptly paid by the

Association. The loss in interest is de minimis, particularly in light of the Association's quicker payment of claims in amounts greater than the deposits.

The policyholders contend that G.S. 58-155.48(a)(1) creates an entirely separate class of claims not covered by G.S. 58-185. The Association is required by G.S. 58-155.48(a)(1) to pay claims on policies terminated by the insolvency of an insurer arising within a thirty-day period *after* the adjudication of insolvency and before an insured has replaced the policy. On the other hand, G.S. 58-155.25 fixes the rights and liabilities of the parties as of the day of insolvency unless otherwise specified by the court. Along the same lines, the policyholders contend the "$100-over $300,000-under" exclusion conflicts with the pro rata distribution requirement of G.S. 58-185, thus extending coverage at the expense of their liens. This is not so. Neither the thirty-day extension nor the amount of the exclusion expands the liens. The liens of policyholders remain the same and remain limited pro rata "for the amounts due them." G.S. 58-185.

Finally, the policyholders argue that the Association can consume the deposit funds for Association expenses and thereby dilute their fixed rights. Such is not the case. The statute does authorize the use of deposits after claims of over $100 are paid "to the extent those deposits are needed to pay all expenses of the Association relating to the insurer." G.S. 58-155.60. However, this is only a temporary use. All deposits must be applied to claims and liabilities except for a minor amount related to the Commissioner's expenses in selling the bonds. G.S. 58-184. The only rights the Association has against the deposits are the subrogation rights under G.S. 58-155.51(a). The Association does not have a right to debit deposits for its expenses unless *all* deposit liens are satisfied and there is a surplus of deposit proceeds.

The expenses of the Association are accorded "the same priority as the liquidator's expenses." G.S. 58-155.51(b). However, that priority extends only to general assets. Special deposits are not general assets. Thus, the mechanism of this statute does nothing to dilute any rights of policyholders.

The Commissioner contends the Association is required to repay all of the deposit to the Commissioner. His authority for

this contention is the statute's provisions that "the Association shall *account* to the Commissioner and the insolvent insurer for all deposits received from the Commissioner hereunder." The Commissioner would have us construe the word "account" to mean "pay over" to the receiver the entire special deposit of $185,000. The Commissioner also cites G.S. 58-155.51(c), which requires the Association to file statements with the liquidator or receiver to "preserve the rights of the Association against the assets of the insolvent insurer," as authority for his position that the Association has only temporary use of the deposits. We reject the Commissioner's argument insofar as it would require absurd repayments of funds the Association has paid to policyholders. The Association must account to the Commissioner on how it uses and applies *all* the funds. When all is said and done, it must establish that every cent of the money was applied to claims or was returned to the Commissioner. The Association can use the funds at the outset to cover its operating expenses. However, the Association has no permanent right in these funds for operating expenses unless all claims are paid and deposit funds remain. Thus, the only repayment to the Commissioner is for the claims under $100 which the Association is not authorized to pay. After all claims are paid, deposit funds can be used by the Association and not refunded to the Commissioner since he would then have no claimants to reimburse.

In summary, the Court of Appeals was correct in its interpretation of G.S. 58-155.60 as not affecting the lien rights of policyholders under G.S. 58-185. The Association has the initial right to use deposit funds to cover operating expenses incident to the insolvent. However, *all* deposit funds must be paid to claimants pro rata as provided by G.S. 58-185. If all claimants are satisfied either directly by the Association or by the Commissioner (if the claim is under $100) and deposit funds remain, then and only then are such funds to be permanently credited to the Association for its expenses. These deposit funds which are provided to the Association as "seed money" must bear fruit for the policyholders and claimants for whom they were placed in trust.

For the reasons stated, the decision of the Court of Appeals is

Modified and affirmed.