313 S.E.2d 253 (1984)
NORTH CAROLINA REINSURANCE FACILITY
v.
NORTH CAROLINA INSURANCE GUARANTY ASSOCIATION, John Randolph Ingram, and Thomas J. Caldarone, as Domiciliary Receiver of American Reserve Insurance Company.
STATE of North Carolina, on Relation of John Randolph INGRAM, Commissioner of Insurance of North Carolina, Plaintiff,
v.
AMERICAN RESERVE INSURANCE COMPANY, Defendant, and
NORTH CAROLINA INSURANCE GUARANTY ASSOCIATION, Third-Party Plaintiff,
v.
Thomas J. CALDARONE, as Commissioner of Insurance of the State of Rhode Island and as Domiciliary Receiver of American Reserve Insurance Company, Third-Party Defendant.
Nos. 8310SC41, 8310SC591.
Court of Appeals of North Carolina.
April 3, 1984.
*255 Atty. Gen. Rufus L. Edmisten by Asst. Atty. Gen. Richard L. Griffin, Raleigh, for Commissioner of Insurance Ingram, appellant.
Bailey, Dixon, Wooten, McDonald & Fountain by J. Ruffin Bailey and Gary S. Parsons, Raleigh, for Commissioner of Insurance Caldarone, appellant/appellee.
Moore, Van Allen & Allen by Arch T. Allen, III, and Joseph W. Eason, Raleigh, for North Carolina Ins. Guar. Ass'n, appellee.
WHICHARD, Judge.

PROCEDURAL BACKGROUND
This litigation arises from the insolvency of American Reserve Insurance Company (American Reserve), a Rhode Island corporation licensed to do business in North Carolina, which was declared insolvent by a Rhode Island court on 7 May 1979.[1] The insolvency order named Rhode Island Commissioner of Insurance Thomas J. Caldarone (Commissioner Caldarone) as domiciliary receiver. On 31 May 1979 North Carolina Commissioner of Insurance John R. Ingram (Commissioner Ingram) requested appointment as ancillary receiver. The Wake County Superior Court granted the appointment, making it permanent on 8 June 1979. The same day it allowed the North Carolina Insurance Guaranty Association (the Association) to intervene and to join Commissioner Caldarone as a third-party defendant. On 10 November 1981 the court entered its order of liquidation, which directed that all claimants file their claims within 120 days and that Commissioner Ingram prepare his report of the North Carolina assets and debts of American Reserve.
On 5 August 1981 the North Carolina Reinsurance Facility (the Facility) filed an independent but related action. Its accounts reflected a balance in favor of American Reserve, and it anticipated a conflict between Commissioner Ingram and the Association over those funds. The Facility, after paying the funds (the interpleader funds) into court, interpleaded *256 Commissioner Ingram and the Association. The court subsequently discharged the Facility and allowed Commissioner Caldarone to intervene. On 8 October 1982 the court entered judgment in favor of the Association. Commissioners Ingram and Caldarone appealed.
Meanwhile, Commissioner Ingram filed his receiver's report on 11 August 1982. The Association and Commissioner Caldarone filed timely exceptions. On 24 January 1983 the court entered summary judgment in favor of the Association. Commissioner Ingram appealed.
Since the primary issue in both cases is disposition of the interpleader funds, this Court granted the unopposed motion of Commissioner Caldarone to consolidate the cases for hearing on appeal.

STANDARD OF REVIEW
The interpleader case was tried on stipulated facts. The court granted summary judgment in the receivership action after the parties agreed there was no dispute as to any material fact. The issues involve statutory interpretation. Full appellate review is therefore appropriate, and the conclusions of law "are reviewable de novo." Humphries v. City of Jacksonville, 300 N.C. 186, 187, 265 S.E.2d 189, 190 (1980).

JURISDICTIONAL AND PROCEDURAL ISSUES

I.
Commissioner Ingram contends the trial court erred in failing to dismiss the cross-claim filed against him by the Association in the Facility's interpleader action. The basis of his contention is the following provision in the order appointing him ancillary receiver in the other action:
[A]ll persons, firms, corporations, municipalities and counties are restrained from interfering in any manner with the property or assets of the respondent American Reserve Insurance Company or with the Ancillary Receiver in the exercise of his duties and are hereby restrained from instituting any suit against said Ancillary Receiver or making any attachment, levy, or lien against the assets of the respondent except by the permission of this court first had and obtained....
Assuming, without deciding, that the court in the Facility's action should have dismissed the cross-claim because of this provision, we find no basis for intervening at this juncture. Commissioner Ingram joined the other parties to the litigation in consenting to the Facility's payment of the funds at issue into court and to the discharge of the Facility from further liability on account of said funds. He thereby in effect consented to assertion of the cross-claim against him in the Facility's action and rendered moot the issue now presented. This Court will not entertain the issue merely to determine a now abstract proposition of law as to whether the trial court should have dismissed the cross-claim. Parent-Teacher Assoc. v. Bd. of Education, 275 N.C. 675, 679, 170 S.E.2d 473, 476 (1969). This assignment of error is therefore overruled.

II.
Commissioner Ingram also contends the trial court in the receivership action erred in refusing to exercise jurisdiction over the interpleader funds involved in the Facility's action. When the order containing this refusal was entered, the Facility's action had been appealed to this Court; and pendency of the appeal was the express basis on which the trial court refused to exercise jurisdiction. "[A]n appeal removes a case from the jurisdiction of the trial court and, pending the appeal, the trial judge is functus officio." Bowen v. Motor Co., 292 N.C. 633, 635, 234 S.E.2d 748, 749 (1977). The refusal to exercise jurisdiction thus was proper.

THE STATUTORY SCHEME
Resolution of this appeal primarily requires statutory interpretation. It involves the interrelation of various parts of Chapter 58 of the General Statutes and two *257 organizations created under it, the Association and the Facility.
The Uniform Insurance Liquidation Act (the Uniform Act), G.S. 58-155.10 to 58-155.17, provides the basic mechanism for the liquidation of American Reserve. Rhode Island, the domicile of American Reserve, is a "reciprocal state" under the Uniform Act. G.S. 58-155.10(9); R.I.Gen. Laws § 27-14-2(7) (1979). Therefore, Commissioner Caldarone, as domiciliary receiver, has primary responsibility for collecting and distributing American Reserve's assets. G.S. 58-155.12; R.I.Gen.Laws §§ 27-14-4, 27-14-5 (1979 & Cum.Supp.1983). Commissioner Ingram, as ancillary receiver, is to recover assets and to liquidate special deposit claims and secured claims which are proved and allowed in the ancillary proceedings. Id.
Foreign casualty companies such as American Reserve must make special deposits of securities as a prerequisite to doing business in North Carolina. G.S. 58-182.1, 58-188. The State Treasurer holds these in safekeeping "for the protection of contract holders." G.S. 58-182.6. The policyholders have a statutory lien on the deposits, G.S. 58-185, which they can enforce by suit for sale by the Commissioner when the company "fails to pay any of its liabilities," G.S. 58-184. These deposits "constitute a trust for the benefit of North Carolina policyholders and are not assets of the insolvent insurance company." Ingram, Comr. of Insurance v. Insurance Co., 303 N.C. 623, 629, 281 S.E.2d 16, 20 (1981) (hereinafter Ingram); see also Guaranty Assoc. v. Assurance Co., 48 N.C.App. 508, 269 S.E.2d 688, disc. rev. denied and appeal dismissed, 301 N.C. 527, 273 S.E.2d 453 (1980), rev'd on other grounds, 455 U.S. 691, 102 S.Ct. 1357, 71 L.Ed.2d 558 (1982). The Uniform Act distinguishes between these "special deposits" and the "general assets" of the insolvent, see G.S. 58-155.10(5), 58-155.10(11), and allows certain claims priority against the special deposits. G.S. 58-155.15. Compare R.I.Gen. Laws §§ 27-14-14, 27-14-15 (1979).
The Association functions to complement these protective deposits. Our Supreme Court has stated:
In 1971, the legislature effected additional protection for North Carolina policyholders by enacting Article 17B, creating an organization, the Insurance Guaranty Association, which would promptly ascertain claims against an insolvent insurer and pay each covered claim of $100 to $300,000 which arises within thirty days of a determination of insolvency. G.S. 58-155.48(a)(1). The purpose of the association "is to provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay in payment, and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer...." G.S. 58-155.42. At least forty-five states have enacted versions of a Model Post-Assessment Guaranty Association Act. See Hank, Post-Assessment Guaranty Funds: Are They the Ultimate Solution to the Insolvency Problem? 1976 Insurance Law Journal 482. It serves as an adjunct to normal liquidation proceedings. See Cooper Claims Service v. Arizona Insurance Guaranty Ass'n., 22 Ariz.App. 156, 158, 524 P.2d 1329, 1331 (1974). The Guaranty Association is a non-profit unincorporated legal entity which covers all property and casualty insurance business transacted in North Carolina. G.S. 58-155.46. All insurance companies licensed to transact business in North Carolina and not exempted by G.S. 58-155.43 must become members of the Association. G.S. 58-155.46. The Association acts as insurer. G.S. 58-155.48(a)(2).
To pay covered claims, the Guaranty Association assesses its members based upon the percentage of business transacted in North Carolina. G.S. 58-155.48(a)(3). The Association has the power to borrow funds to pay covered claims. G.S. 58-155.48(b)(2). Once the Association pays a claim, any person receiving payment "shall be deemed to have assigned his rights under the policy to the Association to the extent of his recovery *258 from the Association." G.S. 58-155.51(a). The Act also provides that "[t]he expenses of the Association ... shall be accorded the same priority as the liquidator's expenses." G.S. 58-155.51(b).
Ingram, supra, 303 N.C. at 630-31, 281 S.E.2d at 21.
In Ingram the Supreme Court considered the effect of the "Quick Access" statute, G.S. 58-155.60,[2] on this scheme. It held that the statute requires the Commissioner to deliver the special deposit proceeds to the Association. The Association may use the proceeds "at the outset" to cover its expenses. "However, the Association has no permanent right in these funds for operating expenses unless all claims are paid and deposit funds remain." Id. at 635, 281 S.E.2d at 23. The Association must (1) pay all claims it is authorized to pay, (2) credit all expenses related to the insolvent if there is any surplus, (3) repay any remaining surplus to the Commissioner, and (4) account to the Commissioner for all funds received. See id.
The parties here have followed this procedure. Commissioner Ingram challenges the allowance of certain expenses against the deposit proceeds, but no party questions the basic structure outlined above.
The primary issue here involves funds generated by American Reserve's participation in the Facility, which assures the ready availability of liability insurance to certain automobile insurance risks.
In 1973, the General Assembly created the Facility to replace the outmoded and largely unworkable Assigned Risk Plan. Essentially, the Facility is a pool of insurers which insures drivers who the insurers determine they do not want to individually insure. The Facility is a creation of North Carolina's Compulsory Automobile Liability Insurance Law. The pertinent provisions are codified in Article 25A, Chapter 58, of the General Statutes. G.S. § 58-248.26 to .40 (1975 Cum.Supp.1979) [hereinafter referred to as "Facility Act"]. Under the Facility Act, all insurance companies which write motor vehicle insurance in North Carolina are required to be members of the Facility. They are required to issue motor vehicle insurance to any "eligible risk" as defined in G.S. 58-248.26(4) who applies for that coverage, if the coverage can be ceded to the Facility. G.S. 58-248.32(a) provides in part that no licensed agent of an insurer may refuse to accept any application from an eligible risk for such insurance and that the agent must immediately bind the coverage applied for if cession of the particular coverage and limits are permitted in the Facility. After writing such coverage, the company has the option of either retaining it as a part of its voluntary business or ceding it to the Facility. If the policy is ceded, the writing company pays to the Facility the net premium, less certain ceding and claims expense allowances, and the Facility *259 is then liable on the particular policy. Should there be a loss under the policy, the ceding company settles the claim and is reimbursed by the Facility.
Hunt v. Reinsurance Facility, 302 N.C. 274, 283, 275 S.E.2d 399, 402-03 (1981). The reimbursement by the Facility ordinarily takes the form of a credit to the member's account against which premiums due and Facility expenses are debited to arrive at a net quarterly figure. Here, however, the Association paid certain losses, which arose after American Reserve became insolvent, on policies ceded by American Reserve to the Facility. Had American Reserve remained solvent, it would have paid the claims itself. The Facility credited American Reserve's account in the amount of the losses paid. (The Association is not a member of the Facility, see G.S. 58-248.27, 58-155.48, 58-155.46, and therefore cannot be credited directly under the governing statutes, see G.S. 58-248.33). This credit constitutes the interpleader funds, the primary subject matter of this litigation.

THE FUNDS AT ISSUE
The special deposits and interest turned over to the Association totaled $97,451.67. The total of allowed special deposit and secured claims is $102,236.57. Of this $70,897.37 represents policyholder claims, which have first priority. G.S. 58-155.60. The remainder represents expenses, $29,839.20 for the Association and $1,500.00 for Commissioner Ingram. Under the order these are to be paid pro rata. The unpaid difference, $4,784.90, is to be paid out of any other assets or property of American Reserve in North Carolina.
Since the court awarded the interpleader funds totaling $22,550.00 to the Association, this remaining unpaid balance will be satisfied out of them. The order directs Commissioner Ingram then to transfer the remainder immediately to Commissioner Caldarone. There also is $13,593.99 in general assets available for possible recovery in the Rhode Island proceedings.

THE INTERPLEADER FUNDS: "ASSETS" OF THE INSOLVENT?
As indicated above, the interpleader funds result from a credit by the Facility to the insolvent, American Reserve, for claims paid by the Association. The statutes do not expressly provide for the disposition of these funds. The legislature provided for sharing of net losses upon the insolvency of a Facility member, but made no provision for net credits. See G.S. 58-248.29. The respective organizing Acts of both the Facility and the Association do not mention the other entity.
Resolution of the issue involves determining the legislative intent in establishing these two organizations. In so doing, we must consider the language of the statutes, the circumstances surrounding their adoption which may throw light on the evils sought to be remedied, and the legislative history. Milk Commission v. Food Stores, 270 N.C. 323, 332, 154 S.E.2d 548, 555 (1967).
The interpleader funds arose as a credit to the named Facility account of American Reserve, pursuant to its regular accounting procedures, when claims on Facility-reinsured policies were paid. The Association, however, actually paid the claims.
The issue involves determination of whether this credit is recoverable by the receivers under G.S. 58-155.12(b), which provides:
The domiciliary receiver for the purpose of liquidating an insurer domiciled in a reciprocal state, shall be vested by operation of law with the title to all the property, contracts, and rights of action, and all of the books and records of the insurer located in this State, and he shall have the immediate right to recover balances due from local agents and to obtain possession of any books and records of the insurer found in this State. He shall also be entitled to recover the other assets of the insurer located in this State except that upon the appointment of an ancillary receiver in this State, the ancillary receiver shall during *260 the ancillary receivership proceedings have the sole right to recover such other assets. The ancillary receiver shall, as soon as practicable, liquidate from their respective securities those special deposit claims and secured claims which are proved and allowed in the ancillary proceedings in this State, and shall pay the necessary expenses of the proceedings. All remaining assets he shall promptly transfer to the domiciliary receiver. Subject to the foregoing provisions the ancillary receiver and his deputies shall have the same powers and be subject to the same duties with respect to the administration of such assets, as a receiver of an insurer domiciled in this State. (Emphasis supplied.)
The credit clearly is not "balances due from local agents" or "books and records." It clearly is not "contracts." Facility membership is imposed by statute, G.S. 58-248.27, and no contract with members is required by its plan of operation.
American Reserve had no "right of action" against the Facility. The statute provides only that the Facility "shall reinsure" the covered risks. G.S. 58-248.33(b). Under standard reinsurance agreements, the reinsurer has no liability, and the reinsured no cause of action, until the reinsured has paid the loss. Fidelity & Deposit Co. of Maryland v. Pink, 302 U.S. 224, 227-29, 58 S.Ct. 162, 163-64, 82 L.Ed. 213, 215-16 (1937), reh'g denied, 302 U.S. 780, 58 S.Ct. 407, 82 L.Ed. 603 (1938); 13A J. Appleman, Insurance Law and Practice § 7695, at 537-38 (1976). Nothing in the statutory reinsurance scheme here suggests a different rule; instead, the legislature took care to ensure that the Facility would not be considered the primary insurer, but only a reinsurer. See G.S. 58-248.33(g)(6); 58-248.26(1); and 58-248.31(a). American Reserve never paid the claims in question, and has not suffered injury by the Facility's failure to pay in its behalf. It thus has no "right of action" against the Facility. See R.R. v. Highway Commission, 268 N.C. 92, 96, 150 S.E.2d 70, 73 (1966); 1 C.J.S. Actions § 15.a (1936).
The receivers, to recover the interpleader funds, must therefore show that the funds are either "property" or "other assets." Under the rules of statutory construction, "[t]he word `property' ... include[s] all property, both real and personal." G.S. 12-3(6). No party contends the funds are real property. "The words `personal property' ... include moneys, goods, chattels, choses in action and evidences of debt, including all things capable of ownership, not descendable to heirs at law." Id. The account entry at issue does not appear to fit any of these definitions. See Black's Law Dictionary 219 (5th ed. 1979) ("chose in action"); id. at 499 ("evidence of debt"); 73 C.J.S. Property §§ 14, 21-22 (1983). The absence of a "right of action" in American Reserve to recover the funds reinforces this conclusion. See Black's Law Dictionary 1095 (5th ed. 1979) ("property"); 63 Am.Jur.2d Property §§ 1, 22 (1972); 73 C.J.S. Property §§ 5, 6 (1983). A holding that these funds are not "property" of American Reserve does not appear to be "inconsistent with the manifest intent of the General Assembly, or repugnant to the context of the ... statute." G.S. 12-3; see Trust Co. v. Wolfe, 243 N.C. 469, 475, 91 S.E.2d 246, 251 (1956). We thus hold that the funds are not "property" of American Reserve.
The receivers may recover these funds, then, only if they are "other assets" of American Reserve. The parties accordingly have focused on the definition of "assets." The term is not defined generally in Chapter 12 of the General Statutes, but G.S. 58-155.10(5) provides the following definition for purposes of the Uniform Act:
"General assets" means all property, real, personal, or otherwise, not specifically mortgaged, pledged, deposited, or otherwise encumbered for the security or benefit of specified persons or a limited class or classes of persons, and as to such specifically encumbered property the term includes all such property or its proceeds in excess of the amount necessary to discharge the sum or sums secured thereby. Assets held in trust and *261 assets held on deposit for the security or benefit of all policyholders, or all policyholders and creditors in the United States, shall be deemed general assets.
As pointed out above, the account entry is not real or personal property of American Reserve. For the receivers to prevail, then, it must fall under "or otherwise" within the intended meaning of that term as used in G.S. 58-155.10(5).
North Carolina law sheds no light on this term. The section quoted above was taken verbatim from a 1939 report of the National Conference of Commissioners on Uniform State Laws. See Unif. Insurers Liquidation Act § 1(8), 13 U.L.A. 435 (Master ed. 1980). It superseded an earlier draft which did not contain the phrase "or otherwise" or the language regarding the classes benefitted by special deposits. The earlier draft read:

"General assets" means all property, real or personal, not specifically mortgaged, pledged, deposited as security or otherwise encumbered, and as to such specifically encumbered property the term includes all in excess of the amount necessary to discharge the sum or sums secured.
Report of the Committee on a Uniform Reciprocal Liquidation Act for Insurance Companies, in Handbook of the National Conference of Commissioners on Uniform State Laws and Proceedings of the Forty-Eighth Annual Conference 369, 374 (1938). The only language explaining the change appears in the commissioners' prefatory note: "Insurance company assets take the form, for the most part, of special deposits required by state law, balances in the hands of insurance agents, policy premiums due but unpaid, and investments of reserve funds." Unif. Insurers Liquidation Act commissioners' prefatory note, 13 U.L.A. 429-30 (Master ed. 1980). Addition of "or otherwise" and the other new language apparently came in response to concern that these special deposits would be dissipated by local creditors because of their unique trust characteristics. See United States v. Knott, 298 U.S. 544, 56 S.Ct. 902, 80 L.Ed. 1321 (1936); Continental Bank & Trust Co. v. Gold, 140 F.Supp. 252 (E.D.N.C.1956); Unif. Insurers Liquidation Act commissioners' prefatory note, 13 U.L.A., supra, at 430-31. The unique nature and recent vintage of statutory reinsurance proceeds tend to confirm an interpretation that the statutory definition of "assets" of insolvent companies does not include them.
The definition of "assets" in other contexts tends to support this reading of the statute. Assets are generally defined as property of any kind, whether real or personal, tangible or intangible, legal or equitable, which can be made available for the payment of debts. Spagnola v. Iowa Employment Security Comm., 237 Iowa 645, 646-47, 23 N.W.2d 433, 434 (1946); Black's Law Dictionary 108 (5th ed. 1979); see also 19 J. Appleman, Insurance Law and Practice § 10352, at 157 (1982) ("admitted assets" are those available for discharging liabilities). Since American Reserve had no right of action to recover the interpleader funds, it could not have made them available to pay its creditors. Similarly, under federal bankruptcy law American Reserve held at most bare legal title to the Facility account. By analogy, the most it could pass to the receivers would be its bare legal title, excluding any equitable interest in the interpleader funds. See 11 U.S.C. §§ 541(a)(1), (d) (1982); 4 L. King, Collier on Bankruptcy ¶ 541.24 (15th ed. 1983). Traditional accounting principles also do not provide for these funds to be assets of American Reserve. See E. Faris, Jr., Accounting for Lawyers 319 (3d ed. 1975); B. Ferst & S. Ferst, Basic Accounting for Lawyers 31-35 (2d ed. 1965).
The Commissioners cite numerous reinsurance cases for the proposition that reinsurance proceeds are assets of the insolvent, and that therefore the Association cannot assert a claim against them. See, e.g., General Reinsurance Corp. v. Missouri General Insurance Co., 458 F.Supp. 1 (W.D.Mo.1977), aff'd, 596 F.2d 330 (8th Cir.1979); Skandia America Reinsurance Corp. v. Schenck, 441 F.Supp. 715 (S.D.N. Y.1977). These cases are distinguishable, *262 however, in that they deal exclusively with private, as opposed to statutory, reinsurance. Whether private reinsurance proceeds constitute an asset of an insolvent insurer "lies in the nature of a reinsurance contract." State of Florida, ex rel. O'Malley v. Department of Insurance, 155 Ind. App. 168, 177, 291 N.E.2d 907, 912 (1973) (holding that proceeds were asset of insurer). The reinsurance here, by contrast, resulted from statutory mandate. G.S. 58-248.27, 58-248.33. The relationship between the Facility and American Reserve therefore is not controlled by the contractual principles applied in the private reinsurance cases.
We conclude that the trial court ruled correctly that the interpleader funds are not assets of American Reserve, and that they are therefore not recoverable by the receivers under G.S. 58-155.12(b). This resolution accords with that of the only other court which has considered the issue, the Supreme Judicial Court of Massachusetts. Massachusetts Motor Vehicle Reinsurance Facility v. Commissioner of Insurance, 379 Mass. 527, 400 N.E.2d 221 (1980) (the Massachusetts case). That court held specifically that the facility funds were not assets of the insolvent insurer. Id. at 532 n. 9, 400 N.E.2d at 224 n. 9. It also considered the above private reinsurance cases, and it, too, held that they did not control.
The Uniform Act provides that it "shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states that enact it." G.S. 58-155.17. Our holding in accord with the Massachusetts case therefore furthers the express goal of the Uniform Act. Although the Massachusetts case was not decided under the Uniform Act, the court addressed its applicability and indicated that it would reach the same result thereunder. Id. at 532 n. 9, 400 N.E.2d at 224 n. 9.
Our legislature requires that all automobile liability insurers be members of both the Association and the Facility. G.S. 58-155.46, 58-248.27. The purpose of the Association is to protect the policyholders of insolvent insurers. G.S. 58-155.42. The purpose of the Facility is to compel insurers to provide automobile liability insurance to all eligible risks. G.S. 58-248.33(a). The legislature intended to keep the additional costs to insurance consumers for these measures as low as possible. See G.S. 58-155.48(a)(3), 58-248.33(l). The Association has priority in the use of available statutorily mandated resources in settling claims in insurer insolvencies. See G.S. 58-155.60, 58-155.51(b); Ingram, supra.
G.S. 58-155.48(a)(2) provides that the Association shall "[b]e deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent." Had American Reserve remained solvent, it would have paid the claims and had a right to the credit from the Facility. The Association is thus deemed the insurer with respect to the interpleader funds. Having paid the claims in full in the place of American Reserve, it is entitled to reimbursement equal to American Reserve's entitlement had it not become insolvent. G.S. 58-155.48(a)(2). This operates to place more funds in the hands of the member insurers, thus tending to lower the Association's costs, and consequently the premiums of policyholders of its members, in accord with legislative intent.
To hold otherwise would result in a windfall to the receiver, especially where the insolvent's liabilities on Facility-reinsured policies far exceed special deposits. The receivers correctly argue that the Facility proceeds are not generated by the Association, but by premiums. The policies reinsured were liability policies only, however, and neither the policyholder nor the insurer builds any "equity" in premiums paid into the Facility. No provision is made for refunds when a member withdraws from the Facility. See G.S. 58-248.27, 58-248.28. Disposition of Facility funds depends exclusively on payment of losses, not on who pays premiums. Without the Facility, *263 these funds would not have been available except from American Reserve internal funds or private reinsurance. The Association still would have to pay the losses. It is therefore consistent with the purposes of these organizations to allow the Association to recover the interpleader funds.
Again, this decision accords with the Massachusetts case. The court there also reviewed the purpose of two state-created organizations, identical in purpose to the Association and the Facility, and held: "When the over-all statutory insurance scheme is considered, it appears that the [l]egislature must have intended that the [equivalent of the Association] have a direct right to Facility proceeds by virtue of [the equivalent of G.S. 58-155.48(a)(2) ], and we so hold." 379 Mass. at 535, 400 N.E.2d at 225. Again, then, our holding serves the goal of consistent construction of the Uniform Act. G.S. 58-155.17.

EXPENSES
Commissioner Ingram contends the court in the receivership action erred in allowing the expenses of the Association as a second priority claim against surplus special deposit proceeds. Our Supreme Court has stated:
The Association has the initial right to use deposit funds to cover operating expenses incident to the insolvent. However, all deposit funds must be paid to claimants pro rata as provided by G.S. 58-185. If all claimants are satisfied either directly by the Association or by the Commissioner (if the claim is under $100) and deposit funds remain, then and only then are such funds to be permanently credited to the Association for its expenses.
Ingram, supra, 303 N.C. at 635, 281 S.E.2d at 23. The Ingram opinion does not distinguish between "allowing" and "paying" expenses, and neither it nor the statute it construed, G.S. 58-155.60, refers to "second priority" claims. Regardless of the terminology employed, however, the effect of the order here was approved in Ingram. We thus find this contention without merit.
Commissioner Ingram also asserts that G.S. 58-155.25 operates to bar Association expenses incurred after the order of liquidation. That statute provides:
The rights and liabilities of the insurer and of its creditors, policyholders, stockholders, members, subscribers and all other persons interested in its estate shall, unless otherwise directed by the court, be fixed as of the date on which the order directing the liquidation of the insurer is filed in the office of the clerk of the court which made the order....
The Association does not fall within any of the described classes. Deposit proceeds do not become part of the "estate" until after all expense claims have been satisfied. Ingram, supra, 303 N.C. at 634-35, 281 S.E.2d at 23; see 65 Am.Jur.2d Receivers §§ 152-59 (1972); 75 C.J.S. Receivers § 108 (1952) (defining estate). Even if the Association came within the provisions of G.S. 58-155.25, that statute must be read in conjunction with G.S. 58-155.60, which authorizes payment of "all expenses of the Association relating to the insurer." (Emphasis supplied.) As noted in Ingram, G.S. 58-155.60 applies "[n]otwithstanding any other provision of Chapter 58 of the General Statutes pertaining to the use of deposits" and thus "controls should there be any conflict in pre-existing provisions." 303 N.C. at 633, 281 S.E.2d at 22.[3] Although in this case the Association's claim adjustment expenses had long become final when the liquidation order was issued, it is possible, particularly with domestic insurers, that in other cases the Association would continue to incur such expenses, in addition to its administrative expenses, subsequent to such an order. We do not believe the legislature intended to limit the Association's expense recovery under G.S. 58-155.60. The role of the Association in this context more closely resembles that of the *264 receiver than of a creditor. The expenses of the receiver are not fixed as of the date of the liquidation order; he may continue to incur reasonable expenses and properly claim them. See Surety Corp. v. Sharpe, 236 N.C. 35, 52, 72 S.E.2d 109, 124-25 (1952); 66 Am.Jur.2d Receivers § 281 (1973); 75 C.J.S. Receivers § 379 (1952). By analogy, and by the terms of the statute, we find the order proper.

DISPOSITION OF REMAINING GENERAL ASSETS
Commissioner Ingram finally contends the court erred in directing "immediate transfer" of all remaining surplus proceeds to Commissioner Caldarone, the domiciliary receiver. G.S. 58-155.12(b) gives the ancillary receiver "the same powers" as the domiciliary. This grant, Commissioner Ingram argues, includes the power to pay general creditors.
By its very terms, however, the statute subjects the general grant to its specific provisions, which limit the ancillary receiver's power to liquidating "special deposit claims and secured claims." "All remaining assets he [the ancillary receiver] shall promptly transfer to the domiciliary receiver." Id. The statutory mandate is clear, and the order was in accord therewith.
We note that the position urged by Commissioner Ingram is precisely the "evil sought to be remedied" by the Uniform Act.
Creditors in non-domiciliary states are, generally speaking, at liberty to prefer themselves by commencing attachment or similar proceedings against such property as may be found in their respective states. This, of course, results in inequity as to other creditors. (See Clark v. [Williard] Willard, 294 U.S. 211, 55 S.Ct. 356 [79 L.Ed. 865] (1935) for such a case.)
Wasteful conflicts are likely to arise between the domiciliary and the ancillary receivers during the administration of the assets since each receiver feels bound to seize as much of the company's property as possible in order that he may protect local creditors to the greatest possible extent.
Report of the Committee on a Uniform Reciprocal Liquidation Act for Insurance Companies, supra, at 370; see also Unif. Insurers Liquidation Act commissioners' prefatory note, 13 U.L.A., supra, at 429-31. By requiring consolidation of general assets with the domiciliary receiver, while allowing local general creditors to prove their claims locally (see G.S. 58-155.14), the Uniform Act resolves problems both of unfair preferences for local creditors and of unnecessary hardship to them in participating in the domiciliary proceedings.

CONCLUSION
The questions presented were properly before this Court. The orders appealed from correctly applied the law to the undisputed facts. The court properly awarded the interpleader funds to the Association with appropriate restrictions. It did not err in allowing expenses or in ordering immediate transfer of the remaining assets to Commissioner Caldarone. The orders are therefore
Affirmed.
WEBB and WELLS, JJ., concur.
NOTES
[1] A separate insolvency proceeding involved American Reserve's subsidiary, Reserve Insurance Company. See Ingram, Comr. of Insurance v. Insurance Co., 303 N.C. 623, 281 S.E.2d 16 (1981). For a brief description of the events leading up to these insolvencies, see Schacht v. Brown, 711 F.2d 1343, 1345-46 (7th Cir.), cert. denied, ___ U.S. ___, 104 S.Ct. 508, 78 L.Ed.2d 698 (1983).
[2] § 58-155.60. Use of deposits made by insolvent insurer.

Notwithstanding any other provision of Chapter 58 of the General Statutes pertaining to the use of deposits made by insurance companies for the protection of policyholders, the Commissioner shall deliver to the Association, and the Association is hereby authorized to expend, any deposit or deposits previously or hereinafter made, whether or not required by statute, by an insolvent insurer to the extent those deposits are needed by the Association first to pay the covered claims in excess of one hundred dollars ($100.00) as required by this Article and then to the extent those deposits are needed to pay all expenses of the Association relating to the insurer.
....
The Association shall account to the Commissioner and the insolvent insurer for all deposits received from the Commissioner hereunder, and shall repay to the Commissioner a portion of the deposits received which shall be equal to an amount computed by adding the lesser of the amount of the covered claim or one hundred dollars ($100.00) for each covered claim. Said repayment shall in no way prejudice the rights of the Association with regard to the portion of the deposit repaid to the Commissioner. After all of the deposits of the insolvent insurer have been expended by the Association for the purposes set out in this section, the member insurers shall be assessed as provided by this Article to pay any remaining liabilities of the Association arising under this Article. (1979, c. 628). (Provisions relating to insolvent domestic insurers omitted.)
[3] G.S. 58-155.25 was adopted in 1947. Act of April 5, 1947, ch. 923, § 58-155.25, 1947 N.C. Sess.Laws 1284, 1296. G.S. 58-155.60 was adopted in 1979. Act of May 23, 1979, ch. 628, § 1, 1979 N.C.Sess.Laws 660, 660.