[No. B117653. Second Dist.. Div. Seven. May 27. 1998.]

CALIFORNIA INSURANCE GUARANTEE ASSOCIATION, Petitioner,
v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
CHARLES QUACKENBUSH, as Insurance Commissioner, etc., Real
Party in Interest.

COUNSEL

C. Guerry Collins, Charissa Dorian and Mark Fall for Petitioner.

David F. Peterson and Marguerite L. Brown as Amici Curiae on behalf of Petitioner.

Daniel E. Lungren, Attorney General, David S. Chaney and Joseph M. O'Heron, Deputy Attorneys General, for Real Party in Interest.

No appearance for Respondent.

OPINION

**JOHNSON, J.**—This case involves a dispute between the California Insurance Commissioner (Commissioner) and the California Insurance Guarantee

Association (CIGA) over which of them is entitled to the sums CIGA recovered through subrogation actions after it paid covered claims. The Commissioner contends as liquidator of the insolvent insurance company he is entitled to the sums CIGA recovered because they are assets of the insolvent insurer's estate. CIGA contends as the state's statutory insurance guarantee association it is entitled to the sums it recovered through subrogation because it paid the claims. The issue appears to be one of first impression in any jurisdiction.

We conclude to the extent CIGA pays covered claims with its own assets, such as proceeds from the premiums it charges its members, it is entitled to retain the amounts it recovers through subrogation actions. Conversely, to the extent CIGA pays covered claims with "early access distributions" or other assets from the insolvent insurer's estate, the estate is entitled to the proceeds of any subrogation action.

### FACTS AND PROCEEDINGS BELOW

In order to put this dispute into perspective we review the relevant rights and duties of CIGA and the Commissioner upon the insolvency of an insurer domiciled in California. We then describe the facts of this particular case and the proceedings below.

#### A. *CIGA's Rights and Duties.*

CIGA is a statutorily created association of insurers admitted to transact business in California. (Ins. Code, § 1063, subd. (a).)[1] Its purpose is "to provide for each member insurer insolvency insurance as defined in Section 119.5." (*Ibid.*)[2] In other words, CIGA's job is to ameliorate the impact of insurance company insolvency on the persons who would otherwise be left unprotected—policyholders of the insolvent insurer and third parties with claims against such policyholders.

When a court finds an insurer is insolvent CIGA has the duty to pay the insurer's claims obligations to the extent they are "covered claims" as defined by statute. Generally speaking, "covered claims" are "the obligations of an insolvent insurer" which are "imposed by law and within the coverage of an insurance policy of the insolvent insurer . . . which were unpaid by the insolvent insurer . . . ." (§ 1063.1, subd. (c)(1).) "Covered claims" do not include all claims that would have been covered by the insurer had it not

---

[1] All statutory references are to the Insurance Code.

[2] Section 119.5 defines insolvency insurance as "insurance against loss arising from the failure of an insolvent insurer to discharge its obligations under its insurance policies."

become insolvent. Most notably, "covered claims" do not include the "portion of any claim, other than a claim for workers' compensation benefits, that is in excess of five hundred thousand dollars ($500,000)." (§ 1063.1, subd. (c)(7).) A policyholder with a claim in excess of $500,000 must seek payment of the excess amount from the estate of the insolvent insurer. (§ 1033, subd. (a)(2).)[3]

To the extent CIGA pays a covered claim it takes a statutory assignment of the policyholder's claim against the estate of the insolvent insurer. (§ 1063.4, subd. (b).) CIGA "may use the courts to assert or defend any rights the association may have by virtue of [its enabling legislation] as reasonably necessary to fully effectuate the provisions thereof." (§ 1063, subd. (g).) In addition, CIGA "shall be a party in interest in all proceedings involving a covered claim, and shall have the same rights as the insolvent insurer would have had if not in liquidation, including, but not limited to, the right to . . . investigate, adjust, compromise, settle, and pay a covered claim[.]" (§ 1063.2, subd. (b), cl. (2).)

CIGA obtains the funds to pay covered claims from several sources. The most important sources, in terms of revenue, are premiums collected from member insurers and claims against the estates of insolvent insurers.

CIGA is authorized to collect premium payments from its members after an insolvency occurs in order to pay covered claims of the insolvent company. (§ 1063.5.)[4] The premium CIGA may charge any member insurer is limited to 1 percent of that member's net direct premium written in California in the preceding year. (*Ibid.*) Members are required to recoup these payments from their policyholders through a surcharge on their premiums. (§ 1063.14, subd. (a).) In this way, the risk of insurer insolvency is spread among the insurance-buying pubic.

In addition to collecting premium payments from its members, CIGA is authorized to file a claim against the estate of the insolvent insurer for the covered claims it has paid. (§§ 1021, 1033, subd. (a)(2).) While the liquidation proceeding is pending CIGA is entitled to "early access distributions" from the estate, i.e., disbursements of the insolvent insurer's available assets for use in paying covered claims. (§ 1035.5, subd. (a).) As a condition to receiving these early distributions, CIGA must agree to "return to the

---

[3]Effective January 1, 1998, CIGA and policyholders with noncovered claims moved up from fifth to second priority creditors. (§ 1033 as amended by Stats. 1997, ch. 497.)

[4]Section 1063.5 provides, in relevant part: "Each time an insurer becomes insolvent then, to the extent necessary to secure funds for the association for payment of covered claims of that insolvent insurer . . . the association shall collect premium payments from its member insurers sufficient to discharge its obligations."

commissioner such assets previously disbursed as may be required to pay claims of secured creditors and claims falling within the priorities established [by section 1033, subdivision (a)(1)-(5)]." (§ 1035.5, subd. (b)(4).) Upon final distribution, CIGA is entitled to the same pro rata share of the estate's assets as other creditors in the second priority position. (§ 1033, subd. (a)(2).)

A potential source of funds to CIGA, and the subject of this lawsuit, is the money CIGA recovers by bringing subrogation actions after paying covered claims.

B. *The Commissioner's Rights and Duties.*

The Commissioner serves as the liquidator of insolvent insurance companies domiciled in California. (§§ 1011, 1016.) He is vested with title to all the company's "property, contracts, and rights of action" (§ 1064.2, subd. (b)) and authorized to take possession of its "books, records, property, real and personal, and assets . . . ." (§ 1011.)

Section 1037 provides "Upon taking possession of the property and business of [an insolvent insurer], the commissioner . . . [¶] (a) Shall have authority to collect all moneys due [the insolvent insurer], and to do such other acts as are necessary or expedient to collect, conserve, or protect its assets, property, and business [and] [¶] (b) Shall collect all debts due and claims belonging to [the insolvent insurer] . . . ."

The Commissioner has the authority to allow and disallow claims against the insolvent insurer's estate. (§§ 1027, 1032.) Under section 1033, subdivision (a), claims allowed "shall be given preference in the following order: . . . (2) All claims of the California Insurance Guarantee Association . . . and all claims under insurance and annuity policies or contracts . . . of an insolvent insurer that are not covered claims."

In performing the aforementioned duties, ". . . the commissioner shall be deemed to be a trustee for the benefit of all creditors and other persons interested in the estate of the [insolvent insurer] against whom the proceedings are pending." (§ 1057.)

C. *Facts of the Present Case.*

The relevant facts in this case are undisputed.

The Signal Insurance Company was placed in liquidation in January 1978. The Commissioner is Signal's liquidator. CIGA is a claimant against Signal's estate. During the course of Signal's liquidation CIGA has paid

approximately $20 million in covered claims (including administrative expenses), received approximately $5 million in "early access distributions" from Signal's estate, received approximately $15 million in premiums from member insurers and recovered approximately $850,000 through subrogation actions against third parties. CIGA reduced its claim against Signal's estate by the amount of the subrogation recovery.

In preparing for the final distribution of Signal's assets, the Commissioner sought an order from the superior court authorizing him to offset CIGA's subrogation recovery against its claim in the liquidation proceeding on the ground the amount recovered through subrogation was an asset of the estate. By way of illustration, assuming CIGA's claim was $20 million and its subrogation recovery was $800,000, the Commissioner would deduct the $800,000 subrogation recovery from the amount of the distribution due to CIGA on its $20 million claim.[5] CIGA objected to the proposed offset, contending the funds it obtained through subrogation actions were its property, not an asset of Signal's estate. The trial court overruled CIGA's objection and granted the Commissioner's requested order.

CIGA seeks immediate review of the superior court's order, alleging extraordinary relief is necessary because the Commissioner intends to distribute Signal's assets in the very near future and, in accordance with the trial court's order, to set off CIGA's subrogation recovery against its pro rata share of the estate. CIGA avers it has no adequate remedy at law because once Signal's assets are distributed to the numerous creditors nationwide it would be impossible to reverse that action should CIGA prevail on its challenge to the subrogation offset. We issued an order to show cause. For the reasons explained below we grant the writ.

## DISCUSSION

We begin by summarizing the parties' contentions.

■ CIGA argues the funds it obtained through subrogation actions belong to it, not Signal's estate, and therefore those funds should not be deducted from its share of Signal's assets.

In support of this argument, CIGA relies on the well-established doctrine of equitable subrogation which "permits a party who has been required to

[5]As noted above, CIGA reduced its claim against Signal's estate by the amount of its subrogation recovery. In performing the proposed offset, the Commissioner would allow CIGA to add to its claim the amount of the subrogation recovery which it had previously deducted to prevent a double deduction of this amount.

satisfy a loss created by a third party's wrongful act to 'step into the shoes' of the loser and pursue recovery from the responsible wrongdoer." (*Fireman's Fund Ins. Co.* v. *Maryland Casualty Co.* (1994) 21 Cal.App.4th 1586, 1595-1596 [26 Cal.Rptr.2d 762].) In the insurance context, the doctrine "permits the paying insurer to be placed in the shoes of the insured and to pursue recovery from third parties responsible to the insured for the loss for which the insurer was liable and paid." (*Id.* at p. 1596.) According to CIGA, it was like the "paying insurer," having paid covered claims as required by statute, and was thereby entitled to pursue subrogation.

Although its enabling legislation does not specifically state CIGA is entitled to *retain* subrogation recoveries, CIGA maintains its entitlement to these recoveries is implicit in the statutes authorizing it to "use the courts to assert . . . any rights [it] may have by virtue of [its enabling legislation] as reasonably necessary to fully effectuate the provisions thereof" (§ 1063, subd. (g)) and giving it "the same rights as the insolvent insurer would have had if not in liquidation, including, but not limited to, the right to . . . appear, defend, and appeal a claim in a court of competent jurisdiction [and] investigate, adjust, compromise, settle, and pay a covered claim" (§ 1063.2, subd. (b), cls. (1), (2)).

By statute, CIGA has the same rights as Signal would have had were it not insolvent. If Signal was solvent and paid its insured's claims, it would have been subrogated to its insured's rights and entitled to retain any recoveries from third party tortfeasors. Therefore, CIGA reasons, because it paid the claims on Signal's behalf it was subrogated to Signal's insured's rights and entitled to retain any subrogation recoveries.

CIGA further contends there are sound public policy reasons for allowing it to retain the subrogation recoveries.

Before submitting its claim against the insolvent insurer's estate, CIGA subtracts its subrogation recoveries. This benefits the other creditors of the insolvent insurer as well as the general insurance-buying public. The other creditors are benefited because CIGA's claim against the estate is reduced by the amount of its subrogation recoveries thus leaving more assets to be shared by the other creditors. Here, for example, CIGA has reduced its claim against Signal's estate by $850,000 thereby leaving more of Signal's assets available to pay other creditors' claims. In addition, the more of its costs CIGA recovers through subrogation actions the less it needs to assess its members, thus reducing the premiums its members charge the public for insurance.

If CIGA is not allowed to retain its subrogation recoveries it will have no incentive to undertake the time, effort, costs and risks of pursuing subrogation actions against third party tortfeasors. Creditors will lose, the insurance-buying public will lose, and the only persons who will benefit will be the third party tortfeasors who caused the injuries which led to the payment of the claims because for all practical purposes these tortfeasors will be immunized from liability.

The Commissioner contends CIGA's arguments are not supported by the facts, the statutory scheme or public policy.

CIGA's entitlement to subrogation recoveries is, in its own words, premised on the fact it "paid claims using *its own assets* and was thereby entitled to pursue subrogation." The Commissioner points out, however, CIGA relies on early disbursals from the insolvent insurer's estate in order to pay covered claims. These early disbursals are not CIGA's assets, but assets of the estate. (§ 1035.5, subds (a), (b); and see discussion *ante*, at p. 223.) In the present case, CIGA received over $5 million in "early access distributions" from Signal's estate to use in paying its policyholders' covered claims. CIGA cannot claim to be equitably subrogated to claims it pays with the assets of the insolvent's estate.

Moreover, the Commissioner argues, CIGA is a creature of statute and has only those powers the Legislature conferred upon it. (*Isaacson* v. *California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 786 [244 Cal.Rptr. 655, 750 P.2d 297].) The California Legislature did not specifically confer on CIGA the right to retain subrogation recoveries, as the legislatures in other states have done with respect to their insurance guarantee associations.[6] The fact CIGA has "the same rights as the insolvent insurer would have had if not in liquidation" (§ 1063.2, subd. (b)) means CIGA has the right to pursue subrogation from third parties to the same extent the insurer could have pursued subrogation were it not in liquidation. It does not mean CIGA has the right to retain those subrogation recoveries any more than the insurer could have retained them once it became insolvent. (See §§ 1011, 1037 and 1064.2 [vesting title and possession of all assets of insolvent insurer in Commissioner].)

The Commissioner also contends if CIGA can keep the subrogation recoveries then it effectively becomes the highest priority creditor taking ahead of the Commissioner's claim for administrative expenses contrary to the legislative intent expressed in section 1033, subdivision (a)(1).

---

[6]See, e.g., Idaho Code section 41-3608, subdivision (1)(c); Minnesota Statutes Annotated section 60C.05, subdivision (1)(a).

As to CIGA's public policy arguments, the Commissioner points out similar arguments were rejected in *Excess & Cas. Reinsurance Ass'n* v. *Insurance Com'r, etc.* (*Excess*) (9th Cir. 1981) 656 F.2d 491 involving a dispute between the Commissioner and the Florida Insurance Guarantee Association (FIGA) over reinsurance proceeds.

In *Excess,* which also involved the insolvent Signal Insurance Company, the Ninth Circuit held the Commissioner was entitled to the reinsurance proceeds payable to Signal under a contract between Signal and Excess. The court rejected the argument by FIGA, similar to the argument advanced by CIGA in the present case, that because it created the reinsurance proceeds by paying the covered claim it was entitled to retain those proceeds.[7] The court also rejected FIGA's argument the expenditure of its assets in paying the underlying claim entitled it to an equitable lien on the reinsurance proceeds to prevent undue hardship. "Hardship," the court stated, "is unavoidable in insolvency cases." In paying the claim, FIGA was merely performing its statutory duty "to transfer such hardship from the individual policyholder to a larger entity. . . . [¶] [Insurance guarantee] associations exist precisely because insolvencies are anticipated and losses must be absorbed. Granting a super priority to the guaranty association would be unfair to other creditors, including, conceivably, individual policyholders." (656 F.2d at p. 496, fn. omitted.)

The Commissioner concedes allowing CIGA to retain subrogation recoveries might ultimately reduce premium rates to the general public (see *In re Imperial Ins. Co.* (1984) 157 Cal.App.3d 290, 297-298 [203 Cal.Rptr. 664]) but, he contends, it would do so at a significant cost to the insolvent insurers' creditors, including its policyholders—the very persons the insolvency statutes were designed to protect. The Commissioner illustrates this point with the following examples.

Assume CIGA paid $200 in covered claims and recovered $100 in a subrogation action. One other second priority creditor has a claim for $200. The total estate's assets available to second priority creditors are $200 plus CIGA's $100 subrogation recovery.

---

[7]The court held the doctrine of equitable subrogation did not apply to reinsurance proceeds. "Subrogation," the court explained, "entitles one who pays the debt of another to claim the rights of the creditor so paid. [Citation.] The reinsurance contract is between the insurance company and the reinsurance company. The individual policyholder has no claim to reinsurance proceeds. . . . Because a claimant has no rights against the reinsurance company, neither does the guaranty association in the claimant's shoes." (656 F.2d at p. 495.) On this point *Excess* is distinguishable from the case before us because here CIGA does stand in the shoes of the Signal policyholders whose claims it paid.

Under the Commissioner's proposal, the distribution would be as follows:

| | |
|---|---:|
| Available assets (estate + subrogation recovery) | $300 |
| Total claims (CIGA's $200 + policyholder's $200) | $400 |
| Assets divided by claims ($300/400) | 75% |
| CIGA's share ($200 × .75) | $150 |
| Policyholder's share ($200 × .75) | $150 |

Under CIGA's proposal, the distribution would be as follows:

| | |
|---|---:|
| Available assets (estate only—CIGA keeps its subrogation recovery) | $200 |
| CIGA's claim ($200 – $100 subrogation recovery) | $100 |
| Total claims (CIGA's $100 + policyholder's $200) | $300 |
| Assets divided by claims ($200/300) | 67% |
| CIGA's share ($100 × .67) | $ 67 |
| Policyholder's share ($200 × .67) | $134 |
| CIGA'S Total Recovery on $200 Claim | $167 (83%) |
| Policyholder's Recovery on $200 Claim | $134 (67%) |

In these examples CIGA and the other claimant receive the same pro rata share of the insolvent insurer's estate. In the second example, however, CIGA has retained the subrogation recovery and consequently winds up collecting 83 percent of its claim while the other claimant collects only 67 percent of its claim. This inequity becomes worse, the Commissioner explains, when CIGA competes against the insolvent insurer's policyholders for the limited assets of the estate. As previously noted, the Legislature placed a $500,000 cap on the amount CIGA can pay on any claim. (§ 1063.1, subd. (c)(6).) As a result, compensation through CIGA for large damages to the insured or injured claimant may be incomplete. The insured or injured claimant can seek compensation for these "overcap" claims by filing a claim in the liquidation proceeding. However, these claims have the same priority as CIGA's claims. (§ 1033, subd. (a)(2).) Obviously, any CIGA claim of equal priority with the insured or injured claimant will decrease the assets

available to pay the latters' "overcap" claims. (See Comments, *Reinsurance and Insurer Insolvency: The Problem of Direct Recovery by the Original Insured or Injured Claimant* (1982) 29 UCLA L.Rev. 872, 883-884.)

In our view, the proper resolution of this dispute over subrogation recoveries is to render unto CIGA what is CIGA's and render unto the estate what is the estate's. In other words, to the extent CIGA pays covered claims with its own assets, such as proceeds from the premiums it charges its members, it is entitled to retain the amounts it recovers through subrogation actions. Conversely, to the extent CIGA pays covered claims with "early access distributions" or other assets from the insolvent insurer's estate the estate is entitled to the proceeds of any subrogation action.

This resolution is in harmony with the doctrine of equitable subrogation, which assumes the subrogee has used its own funds to pay the debt of another. As expressed in the Restatement of Restitution: "Where *property of one person* is used in discharging an obligation owed by another [and] the other would be unjustly enriched by the retention of the benefit thus conferred, the former is entitled to be subrogated to the position of the obligee [.]" (Rest., Restitution, § 162, italics added.)

Although we cannot change the competition between CIGA and policyholders built into section 1033, subdivision (a)(2), the result we reach is consistent with the public policies of protecting insureds and injured parties with claims against the insolvent insurer as well as the general public which ultimately pays these claims through increased insurance rates. The former benefit from an increase in the assets available to pay their claims to the extent their claims are not completely satisfied by CIGA. The latter benefit by an increase in the assets available to CIGA for the payment of covered claims thus reducing the cost of insolvency insurance to CIGA's members which would be passed on to the public.

We do not believe CIGA needs specific statutory authority to retain subrogation recoveries on claims it paid with its own assets. This authority is implicit in CIGA's exercise of "the same rights as the insolvent insurer would have had if not in liquidation" and its duties to adjust, compromise, settle and pay covered claims. (§ 1063.2, subd. (b).)

We hold, therefore, the Commissioner is not entitled to offset the entire amount of CIGA's subrogation recovery against its claim in a liquidation proceeding. The Commissioner is entitled to offset only the portion of the subrogation recovery which arose out of claims paid with estate assets.

### DISPOSITION

Let a peremptory writ of mandate issue directing the respondent superior court to (1) vacate its order of July 28, 1997, to the extent it authorizes real

party in interest to offset petitioner's claim in the liquidation proceeding by the amount of its subrogation recovery and (2) issue a new and different order authorizing real party to offset only the portion of the subrogation recovery, if any, which arose out of claims paid with estate assets.

Lillie, P. J., and Woods, J., concurred.

A petition for a rehearing was denied June 24, 1998, and the opinion was modified to read as printed above. The petition of real party in interest for review by the Supreme Court was denied August 26, 1998.