**GENERAL REINSURANCE
CORPORATION,**
Petitioner

v.

**AMERICAN BANKERS INSURANCE
COMPANY OF FLORIDA,** American
Reliable Insurance Corporation, Mississippi Insurance Guaranty Association, and Legion Insurance Company,
in Liquidation, Respondents.

Commonwealth Court of Pennsylvania.

Decided Sept. 28, 2009.
Amended May 6, 2010.
Publication Ordered May 17, 2010.

John M. Giunta, Pittsburgh, for respondent, Mississippi Insurance Guaranty Association.

Gaetan J. Alfano, Philadelphia, for respondent, Legion Insurance Company.

OPINION BY Judge LEAVITT.

Before the Court is a Motion for Judgment on the Pleadings filed by the Statutory Liquidator of Legion Insurance Company (In Liquidation) in an interpleader action filed by General Reinsurance Corporation (Gen Re).[1] Gen Re filed this action for the purpose of having the Court determine which party is owed $2,488,336.19 under a 1993 Reinsurance Agreement between Gen Re and MS Casualty Insurance Company. By the 1993 Reinsurance Agreement, Gen Re reinsured a book of workers' compensation insurance business written by MS Casualty Insurance Company, a Mississippi insurer that was later merged into American Bankers Insurance Company.[2] In 2000, Legion purchased this book of business from American Bankers, including the Gen Re reinsurance on that business. The Statutory Liquidator asserts that Gen Re must remit the reinsurance proceeds to the estate of Legion but the Mississippi Insurance Guaranty Association (MIGA) asserts that it is entitled to those proceeds as compensation for the claims MIGA must now pay on Legion's behalf to Mississippi claimants. The Statutory Liquidator responds that MIGA may seek reimbursement from the Legion estate by filing a proof of claim, as has every other state guaranty association affected by Legion's insolvency.

## Background

As set forth in the pleading filed by Gen Re, this matter developed from a series of agreements among Legion, American Bankers, and Gen Re. The legal question is how Legion's insolvency affected Gen Re's duties as reinsurer of business initially written by American Bankers and later assumed by Legion.

The central agreement is the 1993 Reinsurance Agreement, Reinsurance Agreement No. 7747, between Gen Re and American Bankers. Interpleader Complaint, ¶ 12. Under the 1993 Reinsurance Agreement, Gen Re was required to reimburse American Bankers for all claims in excess of $100,000, the amount of underwriting risk retained by American Bankers.[3] After the 1993 Reinsurance Agreement terminated, Gen Re continued to be responsible for claims arising from incidents that occurred prior to January 1, 1996.

---

1. Gen Re filed a "Petition for Review in the Nature of an Action for Equitable Interpleader and/or Declaratory Relief" (Interpleader Complaint).

2. MS Casualty Insurance Company ceased to exist after its merger into American Bankers. By order of April 16, 2006, the caption of this matter has been amended to substitute American Bankers for MS Casualty. This opinion will, therefore, refer to American Bankers, recognizing that it may be its corporate predecessor's name that appears on the relevant documents.

3. The 1993 Reinsurance Agreement covered all the workers' compensation business written by American Bankers including that business initially written by American Reliable Insurance Company (ARIC) and later acquired by American Bankers.

Of next importance are two September 2000 Assumption Reinsurance Agreements. In one, Legion assumed the liabilities for all workers' compensation insurance policies written by American Bankers with effective dates from January 1, 1993, through December 30, 2000. In the second, Legion assumed the liabilities for workers' compensation insurance policies written by ARIC, and later acquired by American Bankers, with effective dates of October 1, 1999, through December 31, 2000. Interpleader Complaint, ¶¶ 10, 11. The 2000 Assumption Reinsurance Agreements made Legion the direct insurer on the policies originally written by American Bankers and by ARIC. In connection with these assumption reinsurance agreements, American Bankers assigned its rights under the 1993 Reinsurance Agreement to Legion. Interpleader Complaint, ¶ 13. Gen Re consented to the assignment.

The next relevant agreement is the Workers' Compensation Loss Portfolio Transfer Agreement of Reinsurance No. 8823 (Loss Portfolio Agreement) of July 1, 2000. Interpleader Complaint, ¶ 15. By this agreement, Legion transferred its claim liability under the policies it assumed from American Bankers and ARIC to Gen Re.

The fifth relevant agreement is Run-off Agreement No. 8824 (Run-off Agreement) between Legion and Gen Re. Interpleader Complaint, ¶ 14. By this agreement, Legion transferred to Gen Re all of its obligations under the policies it issued on or before December 31, 2000.

On July 25, 2003, this Court declared Legion insolvent and ordered it liquidated in accordance with Article V of The Insurance Department Act of 1921.[4] *Koken v.*

*Legion Insurance Company,* 831 A.2d 1196 (Pa.Cmwlth.2003) (single judge decision), *aff'd sub nom. Koken v. Villanova Insurance Company,* 583 Pa. 400, 878 A.2d 51 (2005) (in which the Supreme Court affirmed on the basis of the Commonwealth Court's opinion in *Legion* ). At the time, Gen Re was prepared to remit $2,488,336.19 in reinsurance proceeds to Legion pursuant to the 1993 Reinsurance Agreement, the Run-off Agreement and the Loss Portfolio Agreement (collectively, Gen Re Agreements). However, American Bankers and ARIC informed Gen Re that the funds were payable to them because they had been forced by MIGA to make payments to workers' compensation claimants under the policies they had transferred to Legion in the 2000 Assumption Reinsurance Agreements. American Bankers and ARIC paid more than $3,000,000 in claims and expenses on behalf of Legion even though these claim liabilities had been transferred to Legion.

On May 7, 2004, American Bankers and ARIC initiated a declaratory judgment action in Mississippi state court requesting that MIGA be directed (1) to reimburse plaintiffs for claims already paid on behalf of Legion and (2) to assume liability for future claims of this sort. *MS Casualty Insurance Company and American Reliable Insurance Company v. General Reinsurance Corporation, American Re–Insurance Company and Mississippi Insurance Guaranty Association,* (Miss. Ch., Madison Co., Cause No. 2004–337, filed May 3, 2005). On May 17, 2005, MIGA filed a third-party complaint against the reinsurers, Gen Re and American Re–Insurance Company (Am Re), requesting that in the event MIGA were held liable for the Le-

---

**4.** Article V of The Insurance Department Act of 1921, Act of May 17, 1921, P.L. 789, was added by Section 2 of the Act of December 14, 1977, P.L. 280, *as amended,* 40 P.S. §§ 221.1–221.63.

gion claims, the court should order Gen Re and Am Re to pay MIGA, not the Legion estate.

On June 8, 2005, the Chancery Court of Madison County, Mississippi, entered and ARIC and against MIGA. The court ordered MIGA to reimburse the plaintiffs for all claims already paid on behalf of Legion and to assume responsibility for all future Legion claims. The Court did not address MIGA's third-party complaint against Gen Re and Am Re.[5] MIGA appealed the Chancery Court's decision to the Mississippi Supreme Court.

On October 12, 2005, Gen Re filed the instant Interpleader Complaint with this Court. The Statutory Liquidator filed an answer with new matter. MIGA also filed an answer and new matter. MIGA asserted, *inter alia*, that if it were held liable for the Legion claims paid by American Bankers and ARIC, then it should be entitled to the Gen Re reinsurance proceeds. On joint motion of the parties, this Court stayed Gen Re's Interpleader Complaint, pending a decision by the Mississippi Supreme Court on MIGA's appeal of the Chancery Court's decision. In addition, this Court excused Gen Re from having to participate further in the interpleader action.

On October 26, 2006, the Supreme Court of Mississippi affirmed the decision of the Chancery Court. *Mississippi Insurance Guaranty Association v. MS Casualty Insurance Co. and American Reliable Insurance Co., Inc.,* 947 So.2d 865, 877–878 (Miss.2006). On April 11, 2007, this Court dissolved the stay of the proceedings; granted the application of American Bankers and ARIC to withdraw; and ordered the remaining parties, MIGA and the Stat-

utory Liquidator, to complete discovery in sixty days. When a discovery dispute developed, MIGA filed a motion to compel discovery. In oral argument thereon, the Statutory Liquidator asserted that discovery was unnecessary because the Statutory Liquidator was entitled to judgment as a matter of law. The court stayed MIGA's motion to compel, and directed the Statutory Liquidator to file a dispositive motion. On August 15, 2008, the Statutory Liquidator filed the instant motion for judgment on the pleadings, which has been briefed by the parties and is ready for disposition.

## Motion for Judgment on the Pleadings

The Statutory Liquidator presents three arguments in support of his motion for judgment on the pleadings that the estate of Legion, not MIGA, is entitled to the Gen Re reinsurance proceeds. First, he contends that in light of the decision of the Mississippi Supreme Court, MIGA is collaterally estopped from pursuing an action for the Gen Re reinsurance proceeds in this liquidation proceeding. Second, he contends that there is no statute in Pennsylvania or in Mississippi that authorizes MIGA to demand the reinsurance in question on the theory that it is the "insurer" of Mississippi claims. Third, he contends that MIGA is not entitled to assert third-party beneficiary rights of Mississippi policyholders to the proceeds of the Gen Re reinsurance agreements.

## Standard of Review

 A motion for judgment on the pleadings may be entered where there are no disputed issues of fact and the moving party is entitled to judgment as a matter of law. In determining whether there is a dispute as to facts, the court must confine

---

5. Gen Re and Am Re had been dismissed as parties at the time MIGA filed its third-party complaint. In any case, the issues raised in

MIGA's third-party complaint appear to have been dropped from the Mississippi litigation.

its consideration to the pleadings and relevant documents. *Bata v. Central–Penn National Bank of Philadelphia*, 423 Pa. 373, 378, 224 A.2d 174, 179 (1966). The opposing party's well-pleaded allegations will be viewed as true, but only those facts that are specifically admitted by the objecting party may be weighed against him. *Goldsmith v. City Council of the City of Easton*, 817 A.2d 565, 568 n. 3 (Pa.Cmwlth. 2003). Judgment on the pleadings will be granted where the law is so clear that a trial would be a fruitless exercise. *Bata*, 423 Pa. at 378, 224 A.2d at 178.

### Collateral Estoppel

■ The Statutory Liquidator contends that the Mississippi Supreme Court has disposed of MIGA's claim to the Gen Re reinsurance proceeds and, thus, it is barred by collateral estoppel from pursuing that claim in this Court. The Statutory Liquidator explains that in the Mississippi action, MIGA asserted that the 2000 Assumption Reinsurance Agreements did not effect a novation, leaving American Bankers and ARIC liable for the claims. MIGA lost, and it now has responsibility to pay claims on behalf of Legion's former policyholders. MIGA counters that it did not lose on the issue of its entitlement to the Gen Re proceeds because the Mississippi Supreme Court did not decide that question.

■ Collateral estoppel will bar a second action between the same parties on the same claim but under a different theory. *Fiore v. Department of Environmental Resources*, 96 Pa.Cmwlth. 477, 508 A.2d 371, 374 (1986). However, the prior action bars the second action only as to those matters in issue that are identical, were actually litigated, were essential to the judgment, and were material to the adjudication. *Boron v. Pulaski Township Board of Supervisors*, 960 A.2d 880, 884 n. 7 (Pa.Cmwlth.2008).

When Legion was declared insolvent, MIGA reviewed 181 Legion claims assigned to it and decided that they were not "covered claims under direct insurance," as its liability is defined under the Mississippi guaranty association statute.[6] MIGA transferred these claims to American Bankers and ARIC because they had written the policies that were later assumed by Legion. MIGA acknowledged that it would have to reimburse American Bankers and ARIC for these claims should the Mississippi state courts conclude that MIGA had erred in its interpretation of the Mississippi guaranty association statute. The Mississippi courts did so conclude.

The Mississippi Supreme Court confirmed that (1) the 2000 Assumption Reinsurance Agreements effected a novation, thereby making Legion the insurer; and (2) this novation made the claims under the Legion policies "covered claims" for which MIGA was responsible after Legion became insolvent. *Mississippi Insurance Guaranty Association*, 947 So.2d 865.[7]

---

6. A "covered claim" under Mississippi statute is defined, in relevant part, as

an unpaid claim, including one of unearned premiums, which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this article applies issued by an insurer, if such insurer becomes an insolvent insurer and (1) the claimant or insured is a resident of this state at the time of the insured event,

provided that for entities other than an individual, the residence of a claimant or insured is the state in which its principal place of business is located at the time of the insured event; or (2) the property from which the claim arises is permanently located in this state.

Miss.Code § 83–23–109.

7. More specifically, the Mississippi Supreme Court addressed the following issues: (1)

The Statutory Liquidator argues that it "naturally follows" from these holdings that the Legion estate, not MIGA, is entitled to the Gen Re proceeds. Liquidator's Brief at 14.

The Mississippi Supreme Court did not decide the conflict between the estate of Legion and MIGA over their respective claims to the Gen Re proceeds. The Statutory Liquidator acknowledges that "there is nothing in the Mississippi Supreme Court decision stating or implying that MIGA should have direct access to reinsurance proceeds." Liquidator's Brief at 14. This is true. Further, the Court doubts that the Mississippi Chancery Court even had jurisdiction to issue a holding so directly related to the Legion estate. In short, the Court cannot conclude that MIGA's claim that it is entitled to the Gen Re proceeds has been decided, or could have been decided, by the Mississippi courts. Accordingly, the Mississippi Supreme Court decision does not preclude this Court from considering whether MIGA is entitled to the Gen Re reinsurance proceeds.

## MIGA's Claim to the Gen Re Reinsurance Proceeds

■ The Statutory Liquidator asserts that the Mississippi Code does not authorize MIGA, a state guaranty association, to claim the proceeds of the 1993 Reinsurance Agreement that reinsured the workers' compensation book of business that Legion purchased from American Bankers. In addition, Article V of The Insurance Department Act of 1921 does not authorize MIGA, or any guaranty association, to claim the Gen Re proceeds. To do so would give MIGA a preference over other similarly situated guaranty associations. MIGA, like all guaranty associations, must file a proof of claim with the Statutory Liquidator of Legion.[8] MIGA counters that by virtue of Mississippi statutory law, it stands in the shoes of Legion with respect to the Gen Re Agreements.

MIGA directs the Court to Section 83–23–115(1)(b) of the Mississippi Code, which states that MIGA shall be

*deemed the insurer* to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent.

Miss.Code § 83–23–115(1)(b) (emphasis added). MIGA contends that because Section 83–23–115 has made MIGA the "insurer," it has the authority to assert the rights of Legion under the 1993 Reinsurance Agreement. MIGA, and other guaranty associations have tried this argument before, but never with success.

---

whether the assumption reinsurance agreements constituted a novation; (2) whether the claims are "covered claims under direct insurance," making MIGA liable for the claims; (3) whether MIGA is liable for claims submitted by nonresidents against Mississippi employers; and (4) whether the chancellor abused his discretion in denying various motions of MIGA. *Mississippi Insurance Guaranty Association,* 947 So.2d at 871.

8. Section 558(a) of The Insurance Department Act of 1921 provides in relevant part:
In a liquidation proceeding begun in this Commonwealth against an insurer domiciled in this Commonwealth, claimants re-

siding in foreign countries or in states not reciprocal states must file claims in this Commonwealth, and claimants residing in reciprocal states *may file claims either with the ancillary receivers, if any, in their respective states, or with the domiciliary liquidator.* In reciprocal states, where an ancillary receiver has been appointed, a guaranty association of that state must file its claims with the ancillary receiver. Claims must be filed on or before the last dates fixed for the filing of claims in the domiciliary liquidation proceeding.
40 P.S. § 221.58(a) (emphasis added).

In *General Reinsurance Corp. v. Missouri General Insurance Co.,* 458 F.Supp. 1 (W.D.Mo.1977), MIGA argued that because Section 83–23–115(1)(b) "deemed" it to be "the insurer," it was entitled to assert the rights of the insolvent insurer, Missouri General Insurance Company, under a reinsurance agreement issued by Gen Re to Missouri General. MIGA argued that equity required no less because it had paid the claims in full. The federal district court rejected MIGA's arguments.

First, the district court held that MIGA misconstrued Section 83–23–115(1)(b). It held that the purpose of Section 83–23–115(1)(a) was to allow MIGA to assert defenses to claims that could have been raised by the insurer, such as, for example, the failure to give the insurer timely notice of the loss. *General Reinsurance Corp.,* 458 F.Supp. at 5 (explaining that it was likely that Mississippi state courts would reject MIGA's construction of Section 83–23–115(1)(b)). Second, the district court held that MIGA's position violated Missouri's insurance insolvency statute, which required that all guaranty associations receive the same pro-rata reimbursement of claims paid on behalf of the estate. *Id.*

Likewise in *Skandia America Reinsurance Corp. v. Schenck,* 441 F.Supp. 715 (S.D.N.Y.1977), the federal district court considered a New Jersey statutory provision identical to Section 83–23–115(1)(b) of the Mississippi Code.[9] In that case, the New Jersey Guaranty Association argued that the New Jersey statute made it the "insurer" for purposes of a reinsurance agreement. The district court held that this position did "violence" to the statutory scheme that required all claimants in the same priority class be treated the same. *Skandia,* 441 F.Supp. at 727. Accordingly, it held that the New Jersey Guaranty Association, like all claimants with the same priority as a guaranty association, must file a proof of claim with the receiver of the insolvent insurer.

*Skandia* is consistent with precedent from other federal courts that denied a guaranty association access to the reinsurance that covered the insolvent insurer's book of insurance business that later became the responsibility of the guaranty association. *See, e.g., Skandia America Reinsurance Corp. v. Barnes,* 458 F.Supp. 13 (D.C.Colo.1978) (insolvent insurer's Colorado receiver, not the California Insurance Guaranty Association, was entitled to collect reinsurance owed on claims paid by guaranty associations); *Excess & Casualty Reinsurance Association v. Insurance Commissioner of State of California,* 656 F.2d 491 (9th Cir.1981) (California statutory liquidator, not the Florida Guaranty Association, was entitled to reinsurance proceeds); and *American Re–Insurance Co. v. Insurance Commission of State of California,* 527 F.Supp. 444 (C.D.Cal.1981) (California liquidator, not the guaranty associations of California, Arizona, Iowa, Nevada, Florida, Washing-

---

**9.** Pennsylvania's version of this provision can be found at Section 1803(b)(2) of The Insurance Company Law of 1921 and states, in relevant part, that the Pennsylvania Property and Casualty Insurance Guaranty Association shall

> be deemed the insurer ·to the extent of its obligation on the covered and, to such extent, shall have all rights, duties and obligations of the insolvent insurer as if that insurer had not become insolvent.

40 P.S. § 991.1803(b)(2). The Pennsylvania Guaranty Association has not attempted, at least in this Court, to invoke Section 1803(b)(2) as a way to displace the receiver of the insolvent insurer with respect to reinsurance recoveries. Pennsylvania courts would likely follow the *General Reinsurance Corp.* and *Skandia* construction of this provision.

# 34

ton, Alaska, Kansas, Oregon or Utah, was entitled to reinsurance).

 State insolvency statutes, such as Article V of Pennsylvania's Insurance Department Act of 1921, are designed to give all creditors in the same priority class an equal share of the insolvent insurer's estate. Claims of the highest priority class must be paid 100 percent before claims can be paid to the next priority class of claimants. Estate administration expenses receive the highest priority, and policyholder claims fall next. *Koken v. Legion (Oregon Insurance Guaranty Association)*, 941 A.2d 60, 68 (Pa.Cmwlth. 2008). Because guaranty associations pay claims for policyholders, their claims fall, for the most part, in the policyholder priority class. Guaranty associations are singled out for "early distribution." [10] Otherwise, they are treated no differently than all policyholder claimants. When the final distribution of the estate assets is made, all policyholder claimants, including guaranty associations, will receive the same percentage reimbursement on their claims.

Mississippi law is consistent with these above-cited principles. As noted by the federal district court in *General Reinsurance Corp.*, 458 F.Supp. at 5, the Mississippi insolvency statute did not grant MIGA a greater priority than any other guaranty associations with claims against the estate. Further, the Mississippi Code expressly directs that MIGA shall seek reimbursement for its expenses and claim payments from the estate of the insolvent insurer. Section 83–23–121 of the Mississippi Code states, in relevant part, as follows:

(3) The receiver, liquidator, or statutory successor of an insolvent insurer shall be bound by settlements of covered claims by the association or a similar organization in another state. The court having jurisdiction shall grant such claims priority equal to that which the claimant would have been entitled in the absence of this article against the assets of the insolvent insurer. *The expenses of the association or similar* organization in handling claims *shall be accorded the same priority as the liquidator's expenses.*

(4) *The association shall periodically file with the receiver* or liquidator *of the insolvent insurer statements of the covered claims paid by the association and estimates of anticipated claims on the association, which shall preserve the rights of the association against the assets of the insolvent insurer.*

Miss.Code, § 83–23–121 (emphasis added). It is noteworthy that Section 83–23–121 does not direct or authorize MIGA to seek reimbursement of its expenses and claim payments from the reinsurer that had covered the policies written by the insolvent insurer.

Section 83–23–115(1)(b) of the Mississippi Code authorizes MIGA to act as "insurer" for purposes of adjusting and paying claims. Accordingly, MIGA can assert defenses to a claim that Legion could have asserted. For example, MIGA can, as could have Legion, deny a claim for the reason the policy in question had been cancelled for non-payment of premium.

---

10. Section 536(a) of The Insurance Department Act of 1921 states, in relevant part, as follows:

the liquidator shall make application to the Commonwealth Court for approval of a proposal to disburse assets out of [an insol-

vent] company's marshaled assets, from time to time as such assets become available, to any guaranty association in the Commonwealth or in any other state having substantially the same provision of law.

40 P.S. § 221.36(a).

Likewise, MIGA is "Legion" for purposes of pursuing a subrogation claim against a third-party tortfeasor who may have caused the injury that triggered liability under a workers' compensation policy issued by Legion. *See, e.g.,* Section 319 of the Workers' Compensation Act, Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. § 671 (describing the subrogation rights of an employer or insurer). *See also California Insurance Guarantee Association v. Superior Court,* 64 Cal. App.4th 219, 75 Cal.Rptr.2d 461, 467 (1998) (holding that Guarantee Association was entitled to retain subrogation award on insurance claim paid, which award would be offset against "early access distributions" received from the insolvent insurer's estate).

MIGA argues that the California decision granting the guaranty association, as opposed to the insolvent insurer's receiver, the right to a claim subrogation award is precedent for allowing MIGA to act as the "insurer" for purposes of the 1993 Reinsurance Agreement. In addition to *California Insurance Guarantee Association,* MIGA directs the Court to several other cases that have allowed state guaranty funds to retain payments obtained in the course of their claims administration.

In *Louisiana Insurance Guaranty Association v. State Worker's Compensation Second Injury Board,* 552 So.2d 805 (La. Ct.App.1989), the court held that a guaranty association could retain what it recovered from a workers' compensation second injury fund and need not turn that recovery over to the receiver. In *Louisiana Insurance Guaranty Association v. Watkins,* 842 F.Supp. 913, 918 (E.D.La.1994), the court held that the guaranty association could retain what it received under a performance bond, noting that this was in no way analogous to an improper attempt to displace the liquidator in a reinsurance

agreement. In *North Carolina Reinsurance Facility v. North Carolina Insurance Guaranty Association,* 67 N.C.App. 359, 313 S.E.2d 253 (1984), the court held that the guaranty association was entitled to retain what it received from an automobile insurance risk pool, called a "Reinsurance Facility."

These cases are inapposite. *California Insurance Guarantee Association, State Worker's Compensation Second Injury Board,* and *Watkins* all deal with a guaranty association's recovery on a single claim. As such, the recovery is part and parcel of the guaranty association's handling of a single claim and has the effect of reducing its claim against the estate. It would be unduly cumbersome, and expensive, for the receiver to pursue a claim against a performance bond or a second injury fund located in the state where the claim is being adjudicated.

*North Carolina Reinsurance Facility* is also inapposite, but for different reasons. The Reinsurance Facility was not a private company, such as Gen Re, but a statutory facility established to create a market for high-risk automobile drivers. The statute required all automobile insurers to participate, and it allowed participants to pool their costs of insuring such risks through the Facility. An insolvent insurer had received a credit from the Facility by reason of the claims paid on the insurer's behalf by the North Carolina guaranty association. The North Carolina Court of Appeals refused to allow the receiver for that insolvent insurer to collect the proceeds of the credit that had been generated by the guaranty association's claims payments, for the reason that it would constitute a windfall to the receiver. In so holding, the court observed that cases considering the rights of a receiver to reinsurance had no bearing on the issue at hand, *i.e.,* the construction of a statute creating a market for high-risk drivers. The obverse is also

true. A case construing a North Carolina statute, the purpose of which was to provide insurance to high-risk drivers, has no bearing on whether MIGA can assert Legion's rights under the 1993 Reinsurance Agreement.

In sum, the cases cited by MIGA construe statutes and circumstances that have little relevance to the question of whether MIGA has succeeded to Legion's rights under the 1993 Reinsurance Agreement. Further, these cases in no way detract from the clear and longstanding precedent of *Skandia*, 441 F.Supp. 715, and many other courts, that the statutory provision that deems a state guaranty fund to be the "insurer" is limited in scope.[11] A guaranty fund is the "insurer" for purposes of claims administration but not for purposes of estate administration, including the pursuit of proceeds to a reinsurance agreement to which the "insurer" had been a party.

The Mississippi Code does not authorize MIGA to stand in the shoes of Legion with regard to the reinsurance proceeds subject to the Interpleader Complaint. To the contrary, Section 83–23–121(3) of the Mississippi Code expressly contemplates that MIGA's recourse is to seek reimbursement from the "assets of the insolvent insurer" for the claims it pays. MIGA has a remedy. It may file a proof of claim with the Statutory Liquidator, in accordance with Section 537 of Article V, 40 P.S. § 221.37.[12]

### MIGA as Third–Party Beneficiary of Gen Re Agreements

■ MIGA asserts, as an alternative argument, that it is the statutory successor to every Legion policyholder, or insured, whose workers' compensation claims have been paid by MIGA. As such, MIGA is entitled to assert any third-party beneficiary rights enjoyed by Legion policyholders to the 1993 Reinsurance Agreement. Further, MIGA contends that under the principles established in *Legion*, 831 A.2d 1196, it should be found a third-party beneficiary of the Gen Re Agreements. The Court is not persuaded.

MIGA begins with the argument that the Mississippi Code authorizes MIGA to act as a Legion policyholder with respect to the 1993 Reinsurance Agreement. In support, MIGA points to Section 83–23–121(1) of the Mississippi Code, which states, in relevant part, as follows:

> Any person recovering under this article shall be deemed to have assigned his *rights under the policy* to the association to the extent of his recovery from the association....

MISS. CODE § 83–23–121(1) (emphasis added). MIGA argues that the effect of this statutory provision is to deem MIGA to be the policyholder for all purposes, including the ability to assert a policyholder's third-party beneficiary rights to a reinsurance agreement. There are problems with MIGA's interpretation of Section 83–23–121(1).

First, Section 83–23–121(1) gives MIGA rights conferred by Legion *policies*, but it does not say that MIGA has been assigned

---

11. MIGA notes, correctly, that *General Reinsurance Corp.*, 458 F.Supp. 1, and *Skandia*, 441 F.Supp. 715, are not binding on this Court. The same is true, of course, with respect to the precedent cited by MIGA.

12. It states, in relevant part, as follows:
 (a) Proof of all claims shall be filed with the liquidator in the form required by section 538 on or before the last day for filing specified in the notice required under section 524, except that proofs of claim for cash surrender values or other investment values in life insurance and annuities need not be filed unless the liquidator expressly so requires.
 40 P.S. § 221.37.

rights conferred by Legion *reinsurance agreements*. The plain language of Section 83–23–121(1) does not support MIGA's position that this statutory provision has assigned MIGA rights under any reinsurance agreement.

Second, the assignment of policy rights is limited in scope. In no way does Section 83–23–121(1) compare to Section 83–23–115(1)(b), which states that MIGA shall be "deemed the insurer . . . ." MISS.CODE § 83–23–115(1)(b). Nevertheless, MIGA construes the assignment of rights under a policy to effectively "deem" MIGA the policyholder. Simply, MIGA gives too broad a meaning to the assignment established in Section 83–23–121(1).

Section 83–23–121(1) gives MIGA rights under policies. As is the case for rights MIGA has as successor to the "insurer," these policy rights pertain to the adjudication of claims. This means, for example, that MIGA may assert, consistent with the scope of coverage in a policy, that compensation is not owed to a particular employee because the injury did not occur in the workplace. Section 83–23–121(1) ensures that MIGA never has to pay a particular claim for which the policyholder has no liability.

In short, MIGA's third-party beneficiary argument fails at the threshold. Section 83–23–121 confers on MIGA rights derived from a policy, not rights derived from a reinsurance agreement. Nevertheless, for purposes of completeness, the Court will address the substance of MIGA's argument that it may assert third-party beneficiary rights to reinsurance, as could a policyholder.

MIGA contends that Legion stopped functioning as the insurer when it transferred its obligations to Gen Re and, thus, the Legion estate has lost any entitlement to the Gen Re proceeds. MIGA argues that the entire workers' compensation in-surance program, which migrated from insurer to insurer, must be examined before its third-party beneficiary theory can be decided. It further argues that this factual question requires discovery, which thereby defeats the Statutory Liquidator's motion for judgment on the pleadings. The Statutory Liquidator responds that no discovery is needed because the relevant agreements and applicable law defeat MIGA's third-party beneficiary claims.

■ The general rule is that reinsurance recoveries are general assets of the insolvent insurer estate. *Legion*, 831 A.2d at 1235. Were it otherwise, inequities between policyholder-level claimants could result. An insolvent insurer's books of business may be reinsured by different reinsurers and under different terms; some books of business may not be reinsured at all. For example, a workers' compensation book of business written in Nevada may be reinsured by a high-quality reinsurer that pays claims timely, while an automobile insurance book of business in Utah may be reinsured by a reinsurer on the brink of insolvency that has a history of denying claims for reinsurance without cause. Were guaranty funds, or policyholders, allowed to bypass the proof of claim process in favor of a direct claim against the reinsurer, the Nevada guaranty fund would receive more reimbursement on its claims than would the Utah guaranty fund. Such a result would not comport with the requirement of Article V that the claims of all guaranty funds, as policyholder-level claimants, be treated alike. *Legion (Oregon Insurance Guaranty Association)*, 941 A.2d at 68.

The general rule that reinsurance recoveries are general assets of the estate is based, in part, upon the simple fact that policyholders usually have nothing to do with the insurer's decision on placement of

the reinsurance and do not even know of the existence of reinsurance at the time they purchase coverage from the insolvent insurer. *Housing Authority of Lebanon County v. Envirohousing, Inc.,* 442 F.Supp. 1193, 1196 (M.D.Pa.1977). By pooling all reinsurance recoveries as general assets of the estate, all policyholder claimants, including guaranty associations, will receive the same pro-rata amount on their claims against the estate, as required by Article V.

▮▮▮▮ It is true that in circumstances where a policyholder can assert third-party beneficiary rights to reinsurance proceeds, the effect is to find those reinsurance proceeds not to be assets of the insolvent insurer estate. *Legion,* 831 A.2d 1196. As explained in a recent decision of this Court, a third-party beneficiary's right to reinsurance proceeds may be expressed in the contract itself, or it may be found where compelling circumstances make this recognition appropriate to effect the parties' intentions. *Ario v. Reliance Insurance Company,* 981 A.2d 950, 959 (Pa.Cmwlth.2009). In *Legion,* the Court explained that determining the merits of a policyholder claim for third-party beneficiary status is done on a case-by-case basis, reviewing the relationship among the reinsurer, the reinsured and the direct insured. *Legion,* 831 A.2d at 1236 (citing *Mellon v. Security Mutual Casualty Co.,* 5 Phila.Co.Rptr. 400, 1981 WL 207373 (1981)).

The Statutory Liquidator argues that MIGA cannot possibly claim to be a third-party beneficiary of the 1993 Reinsurance Agreement. In support, the Liquidator points to the Privity Clause, which states:

> However, if [Legion] becomes insolvent, the liability of the Reinsurer shall be modified to the extent set forth in the article entitled INSOLVENCY OF THE COMPANY. *In no instance shall any insured of the Company or any claimant against an insured of the Company have any rights under this Agreement.*

1993 Reinsurance Agreement, art. II, at 2–3 (emphasis added). In turn, the Insolvency Clause states, in relevant part, as follows:

> *In the event of the insolvency of [Legion], the reinsurance proceeds will be paid to [Legion] or the liquidator* on the basis of the claim allowed in the insolvency proceeding without diminution by reason of the inability of [Legion] to pay all or part of the claim.

1993 Reinsurance Agreement, art. XXI, at 15 (emphasis added). Stated otherwise, the Insolvency Clause provides that in the event of Legion's insolvency, Gen Re will indemnify Legion's liquidator for claims paid. The Privity Clause provides that neither a Legion "insured" nor one with a claim against that "insured" can present a claim to Gen Re "in [any] instance." 1993 Reinsurance Agreement, art. II.[13]

MIGA is not daunted by the strongly worded and seemingly airtight contractual prohibition upon "any [Legion] insured" pursuing a claim under the 1993 Reinsurance Agreement "in [any] instance." MIGA argues that the Court must examine the relationships among Legion, American Bankers and ARIC in their entirety to

---

**13.** This latter clause has been construed to eliminate the ability of a policyholder to assert third-party beneficiary rights under a reinsurance agreement. *See, e.g., General Reinsurance Corp.,* 458 F.Supp. 1 (construing the above-quoted contract provision in the reinsurance contract to bar a claim by a guaranty association to reinsurance proceeds). In contrast to the Privity Clause at issue in *Reliance,* 981 A.2d 950, the one in the 1993 Reinsurance Agreements identifies the specific persons that do not have rights under the agreement and can never assert them "in any instance."

decide its claim to the Gen Re proceeds. Again, MIGA fails at the threshold, this time in its attempt to rely on the principles established in *Legion*, 831 A.2d at 1236.

At issue in *Legion* were insurance relationships that did not follow the orthodox insurance paradigm. To begin with, the reinsurance agreements at issue in *Legion* were each a type of facultative reinsurance agreement, which gives the reinsurer the ability to refuse a particular risk. ROBERT W. STRAIN, REINSURANCE CONTRACT WORDING (3d ed. 1998) at 428. Further, the policyholders in *Legion* demonstrated that the reinsurers functioned as the direct insurers because Legion, as the fronting insurer, did not retain any underwriting risk. MIGA makes no such assertions and cannot do so. The reinsurance agreement at issue is not facultative, and it did not impose 100% of the underwriting risk on Gen Re. Rather, American Bankers retained liability for the first $100,000 on each claim. MIGA does not assert that employers who purchased workers' compensation insurance from American Bankers even knew that American Bankers had reinsured this business.

American Bankers and ARIC wrote the business, and MIGA does not assert that either insurer acted as a fronting company for Gen Re. Rather, American Bankers had the actual responsibility for underwriting and pricing the product and then paying the claims. American Bankers' purchase of reinsurance from Gen Re increased its capacity to write this business and stabilized its financial results. *See Legion*, 831 A.2d at 1234. The individual employers who purchased these policies appeared to have no knowledge of the existence of the reinsurance relationship between American Bankers and Gen Re. With the assumption of these policies from American Bankers, Legion became the direct writer of this workers' compensation business. The existence of Gen Re, however, remained obscure, if ever known at all, to the policyholders.

MIGA has no authority under its enabling statute to seek reimbursement from Gen Re on the theory that it, effectively, stands in the shoes of a Legion policyholder for all purposes. Even so, there is no basis for finding that the Legion policyholders were third-party beneficiaries to the 1993 Reinsurance Agreement. It was the expectation of the workers' compensation policyholders that American Bankers, and later Legion, would pay their claims. MIGA has not identified a single employer, as policyholder, that believed that Gen Re functioned as its actual insurer. In short, MIGA has not identified any compelling circumstances of the type identified in *Legion* that would allow the Court to find Legion policyholders in Mississippi to be the intended third-party beneficiaries of the 1993 Reinsurance Agreement. The contract provision that affirmatively bars "any insured" from asserting a direct claim against Gen Re "in [any] instance" governs. Similarly, the Insolvency Clause, requiring Gen Re to pay the liquidator in the event of Legion's insolvency, also governs.

### Conclusion

For all these reasons, the Statutory Liquidator's Motion for Judgment on the Pleadings will be granted, and MIGA's Motion to Compel Discovery will be denied.

### *ORDER*

AND NOW, this 28th day of September, 2009, it is hereby ORDERED that the Statutory Liquidator's Motion for Judgment on the Pleadings is GRANTED and the Mississippi Insurance Guaranty Asso-

ciation's Motion to Compel Discovery is DENIED.